Guy W. Bluff, Esq. NM Fed Bar #19-4
Bluff & Associates (NM Offices)
5520 Midway Park Pl NE
Albuquerque, NM 87109
Tel: 505-881-3200 X 165
gbluff@DreamstyleUS.Com
Counsel for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF NEW MEXICO

| | |
|---|---|
| DREAMSTYLE REMODELING, INC., a New Mexico corporation; DREAMSTYLE REMODELING OF IDAHO, LLC, an Idaho limited liability company<br><br>Plaintiffs<br><br>v.<br><br>RENEWAL BY ANDERSEN, LLC, a Minnesota limited liability company; RENEWAL BY ANDERSEN CORPORATION, a Minnesota corporation; ANDERSEN CORPORATION, a Minnesota corporation | Case No.<br><br>**VERIFIED COMPLAINT VIOLATION OF THE SHERMAN ACT, CLAYTON ACT, AND FOR ANTITRUST AND UNFAIR COMPETITION; WRONGFUL TERMINATION; BREACH OF CONTRACT; FRAUD**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Date Filed:    November 20, 2019<br><br>Trial Date:    Not Set, |

**TABLE OF CONTENTS**

NATURE OF THE ACTION                                                        4

THE PARTIES                                                                 6

JURISDICTION, VENUE, AND INTERSTATE COMMERCE                                7

FACTUAL BACKGROUND

    A.  The Four Retailer Agreements                                       9

    B.  Substantive Provisions in Each Retailer Agreement                 17

RELEVANT MARKETS AND RENEWAL'S MARKET POWER

    A.  Replacement Window and Door Market                                 25

    B.  Renewal's Market Power                                             26

BARRIERS TO ENTRY                                                          27

RENEWAL'S OVERALL SCHEME OF EXCLUSIONARY AND                                27
ANTI-COMPETITIVE CONDUCT

RENEWAL WRONGFULLY TERMINATED ITS RELATIONSHIP
WITH DREAMSTYLE

    A.  Defendants Breached the Retailer Agreements with Plaintiffs
        by Failing to Pay for Warranty and Other Service Repairs to
        Defendants Customers                                              31

    B.  Defendants Breached the Retailer Agreements with Plaintiffs
        by Failing to Adhere to Pricing Terms and by Shipping Defective
        Products                                                          31

    C.  Defendants Wrongfully Terminated, Cancelled, or otherwise        34
        Wrongfully Refused to Extend the Four Retailer Agreements

    D.  Plaintiffs Have Invested Tens of Millions of Dollars            41
        Promoting Renewal

    E.  Dreamstyle Has Been Damaged by the Wrongful Termination         43
        and Illegal Take-over of its Exclusive Territories, Customers,
        and Loss of Goodwill and Interruption to its Business Operations

    F.  Renewal Intentionally Interfered with Numerous Business         46
        Opportunities and Third-Party Agreements of Dreamstyle

CLAIMS FOR RELIEF

| | | |
|---|---|---|
| I. | Violation of the Sherman Act 15 U.S.C. §1<br>Contract, Commination, or Conspiracy in Restraint of Trade | 51 |
| II. | Violation of the Sherman Act 15 U.S.C. §2<br>Unlawful Monopolization | 52 |
| III. | Violation of the Sherman Act 15 U.S.C. §2<br>Attempted Monopolization | 53 |
| IV. | The Exclusivity Clause of the Retailer Agreements Violate<br>Section 3 of the Clayton Act | 54 |
| V: | Violations of Arizona Antitrust Act<br>A.R.S. §44-1401 to §44-1416 | 56 |
| VI. | Violations of Idaho Competition Act<br>Idaho Code Ann. §48-101 to §48-118 | 57 |
| VII. | Violations of New Mexico Unfair Practices Act<br>NMSA §57-1-1 to §57-1-19 | 58 |
| VIII. | Violation of Federal Franchise Rule<br>16 C.F.R. §436 | 59 |
| IX. | Violation of Minnesota Franchise Act<br>Minn. Stat. §80C.01 | 60 |
| X. | Violation of Minnesota Unfair Practices Statute<br>Minn. Stat. §80C.14 | 61 |
| XI. | Wrongful Termination – Breach of Contract | 63 |
| XII. | Tortious Interference with Contract | 64 |
| XIII. | Breach of Contract | 66 |
| XIV. | Fraudulent Inducement | 67 |
| XV. | Common Law Fraud | 69 |
| XVI. | Breach of the Covenant of Good Faith and Fair Dealing | 70 |

PRAYER FOR RELIEF                                                                          70

REQUEST FOR TRIAL BY JURY                                                     71

Plaintiffs Dreamstyle Remodeling, Inc., and Dreamstyle Remodeling of Idaho, LLC (collectively "Dreamstyle" or "Plaintiffs") for their complaint against Defendants Renewal by Andersen LLC, Renewal by Andersen Corporation, and Andersen Corporation (collectively "Renewal" or "Defendants"), states and alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiffs Dreamstyle brings this action against Defendants Renewal under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and 2, Sections 3 and 4 of the Clayton Act (15 U.S.C. §14 and 15) as well as Arizona's Antitrust Act, Ariz. Rev. Stat. § 44-1401, Idaho's Competition Act, Idaho Code Ann. § 48-101, and New Mexico's Unfair Practices Act, N.M. Stat. Ann. §57-1-1.

2.      Plaintiffs have initiated this litigation in response to Defendants' elaborate scheme of anti-competitive conduct devised to retain its monopoly power in the replacement window and door market by improperly and illegally foreclosing Dreamstyle and others from competing in the market.

3.      Specifically, Defendants' anti-competitive conduct as further described below includes engaging in exclusive dealing by forcing its retailers, including Plaintiffs, to sell exclusively Renewal / Andersen products, restricts Plaintiffs' ability to market, purchase, sell, or distribute to its ultimate residential retail customers window and door products manufactured, sold and distributed by other manufacturers  (*e.g.*, Jeld-Wen, Pella Corp, Ply Gem, ProVia, Marvin, Milgard), as well as  non-window and door products (*e.g.* sunrooms, patio rooms, kitchen and bath products, stucco, and other home improvement related products).

4.      In an attempt to maintain its monopoly position in the replacement window and door market in the relevant geographic markets, Defendants have acted in ways that are patently exclusionary, make no economic sense, and are purely anti-competitive.  For

example, despite the fact that Dreamstyle was (until February 1, 2019) one of Renewal's largest retailers and had grown its orders with Renewal for seven consecutive years by an average of thirty-five percent while maintaining excellent customer satisfaction scores, on January 31, 2019, Renewal abruptly terminated its contractual relationship with Dreamstyle in all four of Dreamstyle's markets (Northern Arizona; Tucson, Arizona; Boise, Idaho; and New Mexico).   While Renewal claims that several alleged retailer agreement violations form the basis for Dreamstyle's termination, the primary motivation behind Renewal's actions stem from its desire to maintain its monopoly position and to illegally control its retailer affiliates / franchisees by ensuring that no competing brands or non-window or door products are marketed or sold to customers.   Dreamstyle, recognizing that the market demanded non-Renewal products, articulated to Renewal it's desire to sell additional brands and products, including the obvious pro-competitive effects of doing so, but was subsequently abruptly terminated as a Renewal retailer in violation of both the antitrust laws as well as the illegal retailer agreements.

5.      This action also challenges under Section 1 of the Sherman Act, 15 U.S.C. §1, a no-solicitation and no-hiring contract, combination, or conspiracy between Renewal and its various corporate and other exclusive retailers pursuant to which Renewal prohibited retailers from recruiting or hiring current or former employees and independent contractors of Renewal or any Renewal retailer. As further described below, Renewal enforced this agreement among its nearly 100 corporate and privately-owned retailer stores and locations, as part of an unlawful contract agreement to restrict competition which unfairly suppressed employee wages and unreasonably restrained trade.

6.      This action also alleges that, by wrongfully terminating Dreamstyle, Renewal breached the retailer agreements.  This action also alleges that Renewal engaged

in tortious interference with Dreamstyle's contractual relationships with numerous third-party suppliers and Dreamstyle customers.

7.      Finally, this action alleges that Defendants engaged in numerous actions in violation of the franchise and anti-trust statutes of a number of states.

## THE PARTIES

8.      Plaintiff Dreamstyle Remodeling, Inc. is a New Mexico corporation in good standing, having its principal place of business for its New Mexico operations and main administrative offices for the Plaintiff entities at 1460 North Renaissance Boulevard Northeast, Albuquerque, New Mexico 87107.  Dreamstyle Remodeling, Inc. also maintains offices at 3732 East University Drive, Phoenix, Arizona 85034 ("Phoenix Operations") 3925 Runway Drive, Tucson, Arizona 85705 ("Tucson Operations") and 2485 Great Western Drive, Prescott Valley, Arizona 86314 ("Northern Arizona Operations").

9.      Plaintiff Dreamstyle Remodeling of Idaho, LLC is an Idaho limited liability company in good standing, having its principal place of business at 2728 South Cole Road Suite 110, Boise, Idaho 83709.

10.      Defendant Andersen Corporation ("Andersen") is a Minnesota corporation founded in 1903.  Andersen maintains its manufacturing facility and principal place of business at 100 Fourth Avenue North, Bayport, Minnesota 55003.

11.      Defendant Renewal by Andersen Corporation ("Renewal Corp") is a Minnesota corporation formed and organized on or about June 8, 1998, and with its principal place of business at 9900 Jamaica Avenue South, Cottage Grove, Minnesota 55016.

12.      Defendant Renewal by Andersen LLC ("Renewal LLC") is a Minnesota limited liability company which is the successor entity to Renewal by Andersen Corporation and was formed and organized on or about December 17, 2014.  The sole member of

Renewal by Andersen LLC is SLB Holdings Corporation which is a wholly-owned subsidiary of Andersen Corporation.  Renewal by Andersen LLC maintains is its principal place of business at 9900 Jamaica Avenue South, Cottage Grove, Minnesota 55016.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

13.    For purposes of 28 U.S.C. §1332(c) Plaintiffs are citizens of New Mexico as the main administrative offices for both Plaintiff entities is located at 1460 N Renaissance Blvd NE, Albuquerque, NM 87107.  Plaintiff Dreamstyle Remodeling of Idaho, LLC is also a citizen of Idaho, its state of organization.

14.    For purposes of 28 U.S.C. §1332(a) Defendants are Minnesota corporations or limited liability companies each with their principal place of business located in Washington County, Minnesota.

15.    This Court also has original jurisdiction over the antitrust claims under 28 U.S.C. §1331 and pursuant to 28 U.S.C. §1337(a) as this action arises under Section 1 of the Sherman Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §15 and §26.

16.    This Court has subject matter jurisdiction over the breach of contract, wrongful termination, tortious interference with contract, fraudulent inducement, common law fraud, and breach of the implied covenant claims in this action pursuant to 28 U.S.C. §1332(a) because the amount in controversy on those claims exceeds $75,000, exclusive of interests and costs, and the parties are citizens of different states.

17.    This Court has supplemental jurisdiction over Plaintiffs' state antitrust, unfair practices, and franchise claims under 28 U.S.C. §1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy.  All of Plaintiffs' claims are based upon a common nucleus of operative facts, and the entire action commenced by this Complaint constitutes a single case that should ordinarily be

tried in one judicial proceeding.

18.     28 U.S.C. §1367(c) does not apply because (1) none of Plaintiffs' state law claims raise novel or complex issues of state law; (2) Plaintiffs' state law claims do not substantially predominate the claims over which the district court has original jurisdiction; and (3) there are no compelling reasons for declining jurisdiction.

19.     Venue is proper in the District Court for the District of New Mexico pursuant to 28 U.S.C. §1391(c)(2). New Mexico is where all Plaintiffs maintains their primary administrative offices, business operations, and nerve center where their officers conduct the Plaintiffs' important business.

20.     Venue is proper in the District Court for the District of New Mexico pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this dispute largely occurred in this judicial district – the State of New Mexico.  Venue is also proper in this District pursuant to Section 1 of the Sherman Act, 15 U.S.C. §1, and Section 12 of the Clayton Act, 15 U.S.C. §22 because Defendants have regularly transacted business in this District and the State of New Mexico.

21.     This Court has personal jurisdiction over the Defendants because, *inter alia*, (a) the action arises from contracts with residents of New Mexico which were to be performed in whole or part in New Mexico; (b) Defendants transacted business throughout the United States, including in this District; (c) Defendants have licensed and sold merchandise throughout the United States, including in this District; (d) Defendants have had in the past and continue to maintain substantial, continuous, and systematic activities and contacts with New Mexico which are directly related to Plaintiffs' claims and causes of action; and (e) Defendants were engaged in an illegal anti-competitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

22.     Plaintiffs comprise an affiliation of remodeling contractors who purchase new replacement window, door, and other home improvement products and input them into interstate commerce throughout the Western United States including Arizona, Colorado, Idaho, New Mexico, and Texas.

23.     Plaintiffs and Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects the flow of interstate trade and commerce.

## FACTUAL BACKGROUND

### A.      The Four Retailer Agreements

24.     Since 1989, President and founder Larry A. Chavez, has built Dreamstyle Remodeling's home remodeling business, initially with the sale and installation of sunroom products designed and manufactured by Four Seasons Sunrooms and through the sale and installation of spas through a related entity, Spas Southwest, Inc.

25.     Chavez and Dreamstyle Remodeling became successful in the home remodeling business, and in the fall of 2006, Chavez was offered the opportunity to purchase and acquire, and to become the exclusive New Mexico "Retailer," for various window and door products manufactured by Renewal by Andersen Corporation (hereinafter "Renewal Corp") and its parent corporation, Andersen Corporation.   Dreamstyle Remodeling was also authorized and directed to reference itself in all print, radio, and television advertising as "Renewal by Andersen of New Mexico, brought to you exclusively by Dreamstyle Remodeling, Inc." or similar phraseology.

26.     In or about May 2007, Dreamstyle Remodeling and Renewal Corp entered into a "Retailer Agreement" which defined the various obligations, fees, and payments that Dreamstyle would be required to pay to Renewal (the "New Mexico Agreement").

27.     The New Mexico Agreement included a stated term of five years and further

provided that it could be renewed in successive five-year periods subject to a 180-day advance written notification request requirement.  *See* Exhibit E-pg 5 ¶14, and Exhibit E-pg 16 ¶41, respectively.

28.     The <u>New Mexico Agreement</u> further provided that Dreamstyle Remodeling would have the exclusive right to market and sell Renewal Corp products on an installed basis to end-user residential customers throughout the designated Primary Market Area. The designated Primary Market Area consisted of the majority of the state of New Mexico. *See* Exhibit E- pg 2 at ¶6.

29.     The <u>New Mexico Agreement</u> further required Dreamstyle Remodeling to train its sales, marketing, and construction personnel in strict accordance with the "Renewal System" and to pay for its personnel to attend various training sessions provided by Renewal Corp in Minnesota and to reimburse Renewal Corp for any expenses that it incurred in training Dreamstyle Remodeling's personnel.  *See* Exhibit E-pg 4 at ¶9.

30.     During the first several years, Dreamstyle Remodeling grew its remodeling business, and in particular the sale and installation of Renewal by Andersen window and door products.  At the end of 2008, Chavez was offered by Renewal Corp the opportunity to expand into and acquire another "exclusive" Retailer Agreement, this time for the Northern Arizona market area.

31.     In January 2009, Dreamstyle Remodeling and Renewal Corp entered into a second Retailer Agreement, which also contained an exclusive right to market and sell Renewal by Andersen products on an installed basis to end-user residential customers throughout the designated Primary Market Area, a five-year duration, and the right to renew or extend the agreement upon giving 180-days prior written notice.  *See* Exhibit A pg 18, ¶41. <u>The Northern Arizona Agreement.</u>

32.     In the second Retailer Agreement, the designated Primary Market Area

centered in and around Flagstaff, Arizona but also extended to Supai (Grand Canyon) to the north, Seligman to the west, Winslow to the east, and Prescott / Prescott Valley to the south (approximately 15,000 square miles) ("Northern Arizona Agreement").

33.     The Northern Arizona Agreement was substantially similar in form and content to the New Mexico Agreement with the exception of the designation as to the market or territory to be included and the non-Renewal Products which could be offered.

34.     In November 2009, Dreamstyle Remodeling and Renewal Corp entered into a third Retailer Agreement which contained again an exclusive right to market and sell Renewal by Andersen products on an installed basis to end-user residential customers throughout the designated Primary Market Area, a five-year duration, and the right to renew or extend the agreement upon giving 180-days prior written notice.

35.     In the third Retailer Agreement, the designated Primary Market Area centered in and around Tucson, Arizona, but also extended to Red Rock and Oracle to the north, San Pedro to the west, past Benson to the east, and past Green Valley to the south (approximately 5,000 square miles) ("Tucson Agreement").

36.     The Tucson Agreement was substantially similar in form and content to the Northern Arizona Agreement with the exception of the designation as to the market or territory to be included and the non-Renewal Products which could be offered.

37.     In May 2012, the New Mexico Agreement technically expired according to its terms (the five-year period having lapsed); however, Renewal Corp continued to allow Dreamstyle Remodeling to market exclusively and sell Renewal by Andersen products on an installed basis to end-user residential customers past the expiration date.  Dreamstyle Remodeling did not timely request in writing (within the 180-day period) that the agreement be extended, and Renewal Corp did not cease to take new orders or otherwise offer the New Mexico territory to any other distributor, affiliate, retailer, or ownership group.  Both

Dreamstyle Remodeling and Renewal Corp continued to operate as if the expired agreement was in full force and effect and without regard to the stated expiration date.

38.     Subsequent to the stated expiration date, Renewal Corp tendered another New Mexico Agreement which was later executed by Dreamstyle Remodeling ("Second New Mexico Agreement").   The Second New Mexico Agreement extended through April 30, 2017.

39.     On January 31, 2014, the Northern Arizona Agreement expired according to its terms (the five-year period having lapsed).   Dreamstyle Remodeling did not timely request in writing (within the 180-day period) that the agreement be extended, and Renewal Corp did not cease to take new orders or otherwise offer the Northern Arizona territory to any other distributor, affiliate, retailer, or ownership group.

40.     Although Dreamstyle Remodeling did not formally seek to extend the Northern Arizona Agreement in writing as required by ¶41, Renewal Corp continued to accept new orders which had manufacturing, shipping, and installation dates well beyond the January 31, 2014 expiration date.

41.     On January 20, 2014, Dreamstyle Remodeling and Renewal Corp agreed to renew the Northern Arizona Agreement with an effective date of February 1, 2014, extending for another five (5) year term, expiring January 31, 2019, ("Second Northern Arizona Agreement").  A true and correct copy of the Second Northern Arizona Agreement is attached hereto as Exhibit A.

42.     Beginning in early 2014, Renewal Corp advised Chavez of the availability of yet another exclusive market, this time in and around San Diego, California.  In response to the solicitation from Renewal Corp, Chavez prepared and submitted various business plans, financial documents, and marketing and sales projections to Renewal for consideration.

43.     Another local Renewal ownership group, Moore Holdings, was already

selling Renewal and Andersen products in the central and northern California markets under similar retailer agreements as those entered by Dreamstyle Remodeling.  The Moore ownership group actively pursued the acquisition and award of the San Diego market from Renewal Corp, but due to Dreamstyle Remodeling's demonstrated success in New Mexico, Northern Arizona, and Tucson, Renewal Corp awarded the San Diego market to Dreamstyle Remodeling and the Chavez ownership group.

44.     In order to be awarded the San Diego market, Renewal and Andersen required that Dreamstyle make a franchise fee payment of $67,000 ($33,000 to Renewal and $34,000 to Andersen Corp.  Renewal also demanded and required that Dreamstyle maintain its prospects, customers, and sales information in Renewal's proprietary customer relationship management system ("CRM ") called "Enabled+."

45.     Following notice of award of the San Diego market, the Chavez ownership group formed Dreamstyle Remodeling of San Diego, Inc., a California corporation, as a separate but wholly-owned corporation of the Chavez ownership group, which is owned and controlled by its sole shareholder, President and CEO, Larry A. Chavez.

46.     In June 27, 2014, Dreamstyle Remodeling and Renewal Corp entered into a Fourth Retailer Agreement which contained again an exclusive right to market and sell Renewal by Andersen products on an installed basis to end-user residential customers throughout the designated Primary Market Area, a five-year duration, and the right to renew or extend the agreement upon giving 180-days prior written notice as required by ¶41.

47.     In the Fourth Retailer Agreement, the designated Primary Market Area centered in and around San Diego, California but included the entirety of San Diego County (approximately 4,500 square miles) and had a stated term date extending through June 30, 2019 (*See* ¶14) (the "San Diego Agreement").  A true and correct copy of the <u>San Diego Agreement</u> is attached hereto as Exhibit B.  References to the <u>San Diego Agreement</u> and

related allegations relating to San Diego herein are provided for completeness only.  In July, 2019, Dreamstyle Remodeling of California, Inc. fka Dreamstyle Remodeling of San Diego, Inc. filed a separate complaint against these same Defendants for disputes specific to the Dreamstyle's San Diego operations.  *See* 3:19-cv-01324-L-BLM, <u>Dreamstyle Remodeling of California, Inc. v. Renewal by Andersen, LLC et al</u>, U.S. District Court, Southern District of California.

48.    On October 31, 2014, the <u>Tucson Agreement</u> expired according to its terms (the five-year period having lapsed).  Although Dreamstyle Remodeling did not timely request (within the 180-day period as required by ¶41) that the agreement be extended, Renewal Corp did not cease to take new orders or otherwise offer the Tucson territory to any other distributor, affiliate, retailer, or ownership group.

49.    Although Dreamstyle Remodeling did not formally seek to extend the <u>Tucson Agreement</u> in writing as required by ¶41, Renewal Corp and its successor entity Renewal LLC continued to accept new orders which had manufacturing, shipping, and installation dates beyond the October 31, 2014, expiration date.

50.    During the thirty-one (31) month period of November 2014 through June 2017, Dreamstyle Remodeling, Renewal Corp, and Renewal LLC continued to operate as if the <u>Tucson Agreement</u> was still in full force and effect.  In the thirty-one-month period following expiration, Renewal did not cease to take new orders or otherwise offer the Tucson territory to any other distributor, affiliate, retailer, or ownership group.

51.    On or about December 17, 2014, Renewal by Andersen LLC (Renewal LLC) was organized and formed as a limited liability company by filing articles of organization with the Minnesota Secretary of State.  Renewal LLC is the successor entity to Renewal Corp following its conversion from a corporation to a limited liability company.

52.    Subsequent to the formation of the limited liability company, the day-to-day

business operations, manufacturing processes, shipping, and all other administrative and contractual agreements of Renewal Corp were merged or otherwise acquired by Renewal LLC.

53.     Renewal LLC is the successor in interest to Renewal Corp through operation of law due to: (a) Renewal LLC has expressly or impliedly assumed the obligations of Renewal Corp; (b) there has been a formal successor or merger documents filed with the Minnesota Secretary of State; (c) the transaction between Renewal LLC and Renewal Corp is a *de facto* merger; (d) Renewal LLC is a mere continuation of its predecessor Renewal Corp; (e) there is a commonality of ownership between Renewal LLC and Renewal Corp; (f) both Renewal Corp and Renewal LLC maintain the identical principal executive offices (g) Renewal LLC continued without interrupting the day-to-day operations of Renewal Corp through common facilities and common management, and through the continued use of common computerized systems.[1]

54.     On June 23, 2017, Dreamstyle Remodeling and Renewal agreed to renew the Tucson Agreement with a back-dated effective date of November 1, 2014, extending for another five (5) year term, expiring October 31, 2019 ("Second Tucson Agreement").  A true and correct copy of the Second Tucson Agreement is attached hereto as Exhibit C.

55.     In early 2015, Renewal advised Chavez of the availability of yet another exclusive market, this time in and around Boise, Idaho.  In response to the solicitation from Renewal, Chavez prepared and submitted various business plans, financial documents, and marketing and sales projections to Renewal for consideration.

---

[1]     Due to the merger, acquisition, or succession in interest, there is a commonality of interest between Renewal Corp and Renewal LLC, and the obligations of one are the obligations of the other.  For purposes of readability, Renewal Corp and Renewal LLC are hereinafter collectively referred to as "Renewal" unless the context so otherwise requires.

56.     In Boise, another Renewal affiliate, the Medrano ownership group, was already selling Renewal and Andersen products in the Boise market under Renewal's standard form Retailer Agreement which was similar to those entered into by Dreamstyle Remodeling.  According to Renewal, the Medrano ownership group was failing, and though they requested retention of ownership of the market, Renewal Corp awarded the Boise market to Dreamstyle based on Dreamstyle's demonstrated and continuing success in New Mexico, Northern Arizona, Tucson, and San Diego.

57.     Following notice of award of the Boise market, the Chavez ownership group formed Dreamstyle Remodeling of Idaho LLC, an Idaho limited liability as a separate but wholly owned limited liability company of the Chavez ownership group which is owned and controlled by its sole shareholder, President and CEO, Larry A. Chavez.

58.     In June 2015, Dreamstyle Remodeling and Renewal entered into a Fifth Retailer Agreement which again contained an exclusive right to market and sell Renewal by Andersen products on an installed basis to end-user residential customers throughout the designated Primary Market Area, a five-year duration, and the right to renew or extend the agreement upon giving 180-days prior written notice.

59.     In the Fifth Retailer Agreement, the designated Primary Market Area centered in and around Boise, Idaho but extended to the Oregon state border to the west, past Cuprum to the north, past Ketchum to the east and to the Nevada state border to the South (approximately 25,000 square miles) ("Boise Agreement").  A true and correct copy of the Boise Agreement is attached hereto as Exhibit D.

60.     On April 30, 2017, the Second New Mexico Agreement technically expired according to its terms (the five-year period having lapsed).  Dreamstyle Remodeling did not timely request in writing (within the 180-day period as required by ¶41) that the agreement be extended, and Renewal did not cease to take new orders or otherwise offer the New

Mexico territory to any other distributor, retailer, or affiliate ownership group.

61.     Even though Dreamstyle Remodeling did not formally seek to extend the
Second New Mexico Agreement in writing as required by ¶41, Renewal continued to accept
new orders which had manufacturing, shipping, and installation dates well beyond the April
30, 2017 expiration date.

62.     On June 23, 2017, Dreamstyle Remodeling and Renewal agreed to renew the
Second New Mexico Agreement with a back-dated effective date of May 1, 2017, extending
for another five (5) year term, expiring April 30, 2022 ("Third New Mexico Agreement").
A true and correct copy of the Third New Mexico Agreement is attached hereto as Exhibit
E.

**B.     Substantive Provisions in Each Retailer Agreement**

63.     Collectively, as of June 23, 2017, the Chavez ownership group, comprising
Dreamstyle Remodeling, Inc., Dreamstyle Remodeling of San Diego, Inc., and Dreamstyle
Remodeling of Idaho, LLC (hereinafter collectively "Dreamstyle") and Renewal had in
place five separate Retailer Agreements with the following stated terms (1) Northern
Arizona – expiring January 31, 2019; (2) San Diego – expiring June 30, 2019; (3) Tucson
Arizona – expiring October 31, 2019; (4) Boise – expiring May 31, 2020, and (5) New
Mexico – expiring April 30, 2022.

64.     With the general exception as to the designation of the Market area or region,
the substantive provisions of each of the Four Retailer Agreements between Dreamstyle and
Renewal are nearly identical.

65.     Each Retailer Agreement was authored by Renewal.

66.     Each Retailer Agreement required Dreamstyle to follow and match its
business practices to conform to the "Renewal System" regarding installation procedures,
marketing, and sales approach.  (Retailer Agreements at ¶1).

- 17 -

67.     Each Retailer Agreement required Dreamstyle to display and promote only "Renewal Products" which were specifically identified (e.g. Renewal by Andersen manufactured windows and doors).  (Retailer Agreements at ¶4).

68.     Each Retailer Agreement required Dreamstyle to only use specified and "approved" products and materials purchased from only designated "authorized suppliers" in connection with Renewal Products and their installation.  (Retailer Agreements at ¶5).

69.     Each Retailer Agreement required Dreamstyle to "vigorously promote the sale of Renewal Products throughout the Primary Market Area" and specifically prohibited the marketing of Renewal Products outside the Primary Market Area.  (Retailer Agreements at ¶6).

70.     Each Retailer Agreement granted Dreamstyle the exclusive right to use the Renewal System for resale of Renewal by Andersen products to end-user residential customers in the Primary Market Area and required Renewal to not accept and otherwise prevent sales by other Renewal retailers in the same area.  (Retailer Agreements at ¶7).

71.     Each Retailer Agreement required Dreamstyle to prepare and submit detailed annual business plans, provide detailed financial information of Dreamstyle and its principal, Chavez, and comply with mandatory minimum sales quotas, service and homeowner satisfaction commitments.  (Retailer Agreements at ¶8).

72.     Each Retailer Agreement required Dreamstyle to manage its day-to-day operations to comply with the "Renewal System" and to pay all expenses associated with said system, and require its employees and other personnel to attend various training sessions at Renewal's facilities in Minnesota as well as to require such individuals to continually be trained on the Renewal System.  (Retailer Agreements at ¶9).

73.     Each Retailer Agreement required Dreamstyle to purchase buildings or otherwise lease real estate and then furnish the same in a manner which had to be approved

by Renewal.  (Retailer Agreements at ¶10).  Dreamstyle was thereafter also required to maintain those facilities "in compliance with the Renewal System" or face premature termination of the agreement.  (Retailer Agreements at ¶14).

74.     Each Retailer Agreement required Dreamstyle to pay a franchise fee in the form of tens of thousands of dollars in payments to Renewal for sales materials, sales samples, product samples, displays and brochures for the express purpose of marketing and selling Renewal and Andersen branded products in Dreamstyle's showrooms and at customer in-home demonstrations.

75.     Each Retailer Agreement prohibited Dreamstyle from displaying or selling "non-Renewal Products" unless expressly provided otherwise. (Retailer Agreements at ¶10).

76.     In the Northern Arizona, Tucson, and Boise Agreements, Dreamstyle was authorized to sell ProVia entry doors.  *See* Exhibit A pg 22; Exhibit C pg 20; and Exhibit D pg 21.  Renewal and ProVia have a separate partnership agreement regarding entryway doors since Renewal does not directly manufacture or sell that product.

77.     Under the New Mexico Retailer Agreement, Dreamstyle was authorized to sell sunrooms, stucco, and kitchen and bath products; however, Dreamstyle was specifically precluded from selling window or door products manufactured by Pella, Marvin, Weathershield, Jeld-Wen, Caradco, Hurd, Pozzi, or any other similar regional or national brands.  *See* Exhibit E-pg 28 ¶ 5.

78.     Each Retailer Agreement provided for an initial term of five years and the option to extend in additional five-year increments. (Retailer Agreements at ¶¶14 and 41).

79.     Each Retailer Agreement required Dreamstyle to display the Renewal by Andersen name and logo on its vehicles, uniforms, stationary and all sales and marketing materials.  (Retailer Agreements at ¶14).  *See* Figure 1 Exemplar on page 22 *infra*.

80.     Each Retailer Agreement required Dreamstyle to "vigorously promote" the

sale of Renewal Products for the entire five-year duration throughout each Primary Market Area.   Failure to do so would result in the premature termination of the agreement. (Retailer Agreements at ¶14).

81.     In the event Renewal believed Dreamstyle was somehow violating or failing to comply with its various obligations, the Retailer Agreements also specifically required Renewal provide Dreamstyle with a minimum of 30-days written notice and an opportunity to cure and correct any such alleged violations.  (Retailer Agreements at ¶14).  Despite such requirement, Renewal never provided the 30-days written notice or opportunity to cure but instead unilaterally terminated the agreements effective January 31, 2019.

82.     Each Retailer Agreement contained a "Non-Competition" provision which prevented Dreamstyle, Chavez, and every member of Dreamstyle's directors, officers, key management employees, and their family members from in any way participating in any other business that engaged in the manufacture, sale, promotion, installation, or servicing of any window or door products.  (Retailer Agreements at ¶18).

83.     Despite having separately stated durations and terms as noted in paragraph 63 above, according to Renewal, each Retailer Agreement purportedly allowed Renewal to unilaterally terminate, refuse to extend, or otherwise cancel ALL agreements upon the "expiration" of any single one.

84.     Each Retailer Agreement also required that Dreamstyle (i) participate and pay Renewal for various "national" marketing expenses; (ii) utilize and pay Renewal for the use of its sales, marketing, sales tracking, and ordering software "Enabled+" with initial fees of $20,000, quarterly mandatory "Hosting Fees," of between $750 and $1,500 per Market, and otherwise pay Renewal training-related fees.  Collectively, Dreamstyle paid Renewal in excess of $800,000 per year for these mandatory items.

85.     In addition to having to pay Renewal for "national" marketing expenses, each

Retailer Agreement mandated that Plaintiffs expend tens of millions of dollars in direct marketing expenses for radio ads, television ads, print advertising (newspapers and magazines), direct mailings of print advertising, other paid digital marketing such as Google AdWords, Facebook and dozens of other social media and social networking sites ("traditional marketing") as well as millions of dollars for wages, salaries and other expenses in having its employees attend and promote Renewal and Andersen products at trade shows, local and regional home shows, in store placement booths at True Value Hardware, Ace Hardware, and other similar stores, and in-person canvassing ("non-traditional marketing").

86.     Each Retailer Agreement also mandated that Plaintiffs "actively" market and promote Andersen, Renewal, and Renewal Products through the expenditure of hundreds of thousands of dollars in other types of advertising of the Renewal brand products.  Plaintiffs were required to utilize specific Trade Names in their business operations and were required to have their employees wear common tradename and trademarked "Renewal" branded clothing and apparel; wrap Plaintiffs' trucks, automobiles, and work trailers with Renewal brand imagery; as well as, pay hundreds of thousands of dollars for Renewal brand signage on administrative and retail business locations.  As part of its marketing requirements, Renewal required that advertising be done referencing only the Renewal Brand and with no (or very limited) representations as to the individual company of Dreamstyle Remodeling or Plaintiffs. Defendants mandated Plaintiffs participate in various marketing programs and then would charge Plaintiffs $400,000 to $500,000 per year for the same. *See* Figure 1 for an exemplar of the Renewal mark and brand.

Figure 1 – Renewal by Andersen Mark.



87.     Andersen and Renewal by Andersen provided "operational support" for a fee and "assistance" to its retailers by way of specific requirements that retailers' administrative staff, sales personnel, service, and installation technicians all attend corporate-mandated training programs to learn the "Renewal Process."   Defendants would routinely evaluate Plaintiffs' sales performance across departments and mandate minimum levels of sales.   Plaintiffs were also subjected to quarterly "performance reviews" regarding sales and comparisons with Defendants' minimum levels of quarterly and yearly sales growth percentages and volumes that Defendants mandated be met. When sales growth did not meet Defendants expectations (regardless of the cost or levels of marketing efforts by Plaintiffs), Defendants demanded that corrective action be taken by Plaintiffs.   Similar demands were not made by Defendants to other affiliates for reasons including paid vacations or other cash incentives to Renewal / Andersen regional representatives.

88.     Renewal by Andersen and Andersen exercised significant operating control over the "independent" affiliates and retailers including mandated minimum capital investments, lines of credit to be maintained, and restrictions on which individuals could have equity ownership in the "independent" affiliate.   Defendants mandated that Dreamstyle Remodeling, Inc. close its Tucson Arizona call center operation and move the facilities and personnel to Albuquerque New Mexico.  When Larry Chavez opened a new unrelated bath business in Denver Colorado in January 2018, Defendants objected

claiming that such an operation would "divert" Dreamstyle's focus and attention away from what Defendants mandated should be its primary and principal focus – the exclusive marketing and sale of Renewal Products in Plaintiffs other markets.   Defendants also claimed that Chavez' formation of a new business entity and opening a bath operation in Denver constituted a breach of the Retailer Agreements since it was being operated in a Renewal Market area controlled by another Renewal affiliate.   Defendants also objected to Plaintiff Dreamstyle Remodeling, Inc. from marketing or selling in undesignated / unassigned open territories even when those territories were in close proximity or adjoining to Plaintiffs' existing facilities and assigned zip-codes.

89.   Renewal by Andersen and Andersen exercised significant operational control over the "independent" affiliates and retailers by, among other things, placing restrictions on the individuals who were authorized to act as managers or could even be hired by Dreamstyle, each of whom had to be specifically approved in writing by Renewal by Andersen.   (Retailer Agreements at ¶9).   In one instance, Renewal's vice president Jeanne Junker mandated attendance at an off-site meeting and directed the firing of one of Plaintiff Dreamstyle Remodeling, Inc's general manager John Poole.   In another, Junker advised that Larry Chavez that would be permitted to hire Ken Biddle as General Manager for the San Diego territory "over her dead body."

90.   Renewal by Andersen and Andersen exercised significant operating control over the "independent" affiliates and retailers including mandating minimum sales quotas, revenue requirements, customer satisfaction goals, and the unilateral ability to directly negotiate, or renegotiate, contract terms between an "affiliate" and its end-user residential customer. In one instance, Defendants mandated (Dave Crowell screaming at Plaintiffs' President Larry Chavez) that Dreamstyle Remodeling, Inc. settle and pay more than $50,000 as damages in a copyright infringement litigation with one of Defendants

"preferred" marketing vendors.   In another instance, after themselves supplying defectively manufactured products, Defendants unilaterally cancelled one of Dreamstyle Remodeling, Inc.'s contract with a customer (Hageman) after the majority of work and expense had already been incurred, forcing Dreamstyle Remodeling, Inc. to lose more than $26,000 in revenues.

91.    Renewal by Andersen and Andersen exercised significant operating control over the "independent" affiliates and retailers by requiring Dreamstyle and the other affiliates to maintain their prospects, customers, and sales information in Renewal's proprietary customer relationship management system ("CRM "), Enabled+.   As part of the CRM database, Defendants forced Plaintiffs to develop and pay tens of millions of dollars for customer leads and to populate Defendants databases with customer contact information and upon termination then promptly turned over those same leads to Defendants' other preferred affiliates without compensating Plaintiffs.

92.    The cost to Dreamstyle in developing these prospects and sales leads is significant.  In 2018, the average cost per lead was more than $190.  As of October 15, 2018, Dreamstyle has populated Renewal's Enabled+ CRM with more than 165,500[2] prospects.  By forcing Dreamstyle to use this Renewal-controlled database, Renewal was able to track each prospect and potential sales lead, and more importantly to steal Dreamstyle's prospects and leads for other Renewal affiliate groups without

---

[2]    As of October 15, 2018, Dreamstyle had 165,541 prospects in the Enabled+ database which Dreamstyle developed with its own funds and resources.  At that time, Dreamstyle was increasing its customer prospect database by an additional 3,500+ per month.  Statistically, Dreamstyle's conversion ratio by which a prospect will convert to a sales presentation is 11% (~18,000).  Of these 18,000 sales presentations, 28.2% will result in an actual closed sale with an average price of $11,000.  As of October 15, 2018, Dreamstyle's customer database has calculated a stream of revenue value in excess of $48,500,000.

compensating Dreamstyle.

93.     As an affiliate or retailer, Plaintiffs were required to make payments to Renewal by Andersen of more than $5,000 in the first six months of operation for advertising fees, training fees, and fees for equipment in the form of sales training and sales presentation kits, and for mandatory product samples which were required to be purchased for use in the in-store "displays" that Renewal by Andersen mandated.  Such fees paid by Plaintiffs were not for goods sold at a bona fide wholesale price for resale to their end-user residential customers.  From August 2014 to August 2018, Plaintiffs also directly paid to Renewal more than $600,000 for mandated Renewal advertising services.

## RELEVANT MARKETS AND RENEWAL'S MARKET POWER

**A.**     **Replacement Window and Door Market**

94.     Replacement windows and doors are a relevant product market.

95.     The replacement window and door industry is a subset of the 300 to 400 billion-dollar home improvement and remodeling market nationwide.   Industry professionals estimate that more than 40,000 individuals are employed in the window and door market which has been expanding by three to six percent annually over the past five years.

96.     Due to the increase in residential real estate prices, homeowners are choosing to improve their existing homes instead of purchasing new.  With the advent of new and more energy efficient window and door products, coupled with associated state and federal energy tax credits, the replacement of existing windows and doors at around 15 years old is generally considered advisable.   In terms of a rate of return to investment, replacing windows and doors ranks in the top two areas of home improvement.

97.     While the window and door manufacturing industry itself is comprised of approximately 100 manufacturers throughout the United States manufacturing wood,

composite, vinyl, aluminum and fiberglass framed products, Defendants are the largest manufacturer having annual sales volume of more than four billion dollars.

98.     Defendants maintain their leadership position in the new and replacement window and door manufacturing and distribution through their collective retailer agreements which provide for exclusive areas whereby an affiliate or retailer is not subject to other competition from other manufacturers.

99.     The relevant geographic market at issue in this litigation is the United States. The vast majority of replacement window and doors purchased by remodeling contractors and distribution chains (*e.g.* Home Depot, Lowes) are produced in the United States. Defendants are the largest new and replacement window and door manufacturers in the United States having a collective annual sales volume of more than four billion dollars.

**B.     Renewal's Market Power**

100.    Andersen Windows and Doors, through its parent company, Andersen Corporation, and its affiliated entities and subsidiaries, is the number one manufacturer and distributor of window and door products in North America based on both sales volume and geographic locations.  Renewal by Andersen Corporation and its successor entity, Renewal by Andersen LLC, are wholly-owned subsidiaries of Andersen Corporation, specializing in replacement window products.

101.    In the United States, 93% of Renewal by Andersen locations are operated by independently owned and operated retailers who have executed standard form Retailer Agreements with either Renewal by Andersen LLC or Renewal by Andersen Corporation.   In 2017, Renewal by Andersen, through its seven (7) corporate stores and ninety-plus privately owned retailers, had more than 1.5 billion dollars in revenue and more than 106,000 residential projects completed. Renewal by Andersen boasts on its corporate website that it is "the start-to-finish custom replacement window and door

subsidiary of Andersen Corporation" and that it has the "top replacement window from the most respected brand in the industry."

## BARRIERS TO ENTRY

102.   The relevant product market is characterized by high barriers to entry and expansion.   There are many reasons for this as it applies to potential new entrants and existing competitors.   First, the cost of developing a new, competing product is substantial and would require tens of millions of dollars in design, engineering, and manufacturing infrastructure for initial development and then tens of millions of dollars more to tailor the product to specific customer needs and also to build an effective sales network.

103.   Further, brand name recognition takes many, many years to develop. Builders, developers, architects, and others must invest substantial time and money educating themselves on the products, features, and installation requirements before they will promote or specify any brand in the market.   Moreover, the likelihood of construction defects takes years to overcome, and new manufacturers must start at a local or regional manufacturer level with an emphasis on a particularly small market segment and some unique features (e.g., anti-fog, auto-tinting glass, etc.).

104.   Additional barriers to entry exist in the national market by way of the restrictions that Defendants have placed on the various marketing and advertising processes required for any new manufacturer or seller to effectively and cost-efficiently compete. Defendants routinely mandate agreements with both local and national advertising vendors which prohibit such vendors from working for or with other companies who manufacture, market, sell, or install other fenestration products.

## RENEWAL'S OVERALL SCHEME OF EXCLUSIONARY AND
## ANTI-COMPETITIVE CONDUCT

105.   As part of the Renewal Products line, Renewal does not manufacture or sell

- 27 -

"Entryway" type doors.  Instead, Renewal partners with ProVia LLC which specializes in door manufacturing for this type of product.  As part of its typical Retailer Agreement with Dreamstyle and the other affiliates, Renewal specifically permitted retailers to sell ProVia entryway doors but no other ProVia products.  Because of its billion-dollar plus buying power, Renewal specifically prohibits ProVia from allowing its affiliates, including Dreamstyle, to access ProVia's online product databases, view ProVia's distributor pricing lists, or place orders for any other products which are manufactured by ProVia, such as other door and window product lines.

106.    According to Defendants, except for the <u>New Mexico Agreement</u>, Dreamstyle, its affiliated companies, and its principals, owners and managers were specifically prohibited from marketing, selling, or installing any other non-Renewal products (excepting ProVia entry doors).  In New Mexico, Dreamstyle was permitted to sell some specific non-Renewal Products, including sunrooms, stucco, and kitchen and bath products.  *See* Exhibit E-pg 28, ¶5.  Defendants actively prohibited Plaintiffs from marketing or selling unrelated products in both its assigned territories and in other areas of the western United States.  Defendants also actively controlled the mix of Renewal Products which could be sold by Plaintiffs claiming among other things that the sale of Renewal's Series 2 product would "cannibalize" potential sales of Renewal's more profitable Series 1 products.

107.    Under the <u>Second Northern Arizona Agreement</u>, Renewal attempted to restrict, in restraint of trade, Dreamstyle Remodeling's marketing, sale, and installation of every non-Renewal Product with the exception of ProVia entry doors.  *See* Exhibit A pg 22.

108.    Under the <u>San Diego Agreement</u>, Renewal attempted to restrict, in restraint of trade, Dreamstyle Remodeling's marketing, sale, and installation of every non-Renewal Product.  Dreamstyle was also prohibited from selling "Andersen Series 2" replacement

windows.  *See* Exhibit B pg 23.

109.    Under the <u>Second Tucson Agreement</u>, Renewal attempted to restrict, in restraint of trade, Dreamstyle Remodeling's marketing, sale, and installation of every non-Renewal Product with the exception of ProVia entry doors.  *See* Exhibit C pg 20.

110.    Under the <u>Boise Agreement</u>, Renewal attempted to restrict, in restraint of trade, Dreamstyle Remodeling's marketing, sale, and installation of every non-Renewal Product with the exception of ProVia entry doors.  *See* Exhibit D pg 21.  Under the <u>Boise Agreement</u>, Renewal further attempted to restrict Dreamstyle Remodeling's marketing, sale, and installation "Andersen Series 2" replacement windows.

111.    Under the <u>Third New Mexico Agreement</u>, Renewal attempted to restrict, in restraint of trade, Dreamstyle Remodeling's marketing, sale, and installation of spas, swim spas, stand-alone and built-in fireplaces and manufactured hearths as well as the sale of incidental supplies related to those products (*e.g.* chlorine tablets, brushes, floats, exercise equipment, wood pellets, and metal buckets).  *See* Exhibit E pg 28.

112.    Defendants required that for a company to become an "affiliate" offering the Andersen and Renewal by Andersen products, that they agree to only sell Renewal and Andersen products subject to termination if they carried or sold any competitor products.

113.    Defendants required that in order for a company to become an "affiliate" offering the Andersen and Renewal by Andersen products, that any company looking to contract with Defendants sign a contract which requires that the company may only purchase construction-related materials from manufacturers, distributors, and suppliers from specified suppliers and distributors and they can be terminated if they purchase from non-approved Andersen / Renewal vendors, suppliers, or manufacturers.

114.    Defendants required that in order for a company to become an "affiliate" offering the Andersen and Renewal by Andersen products, that any company looking to

contract with Defendants sign a contract prohibiting that company's owners, immediate family members, directors, officers and all management-level employees, for a period of five (5) years from becoming affiliated with any other company engaged in the sale, promotion, installation or servicing of window and door products manufactured by Andersen.

115.    The contractual provisions which Defendants required that Plaintiffs sign in order to carry the Andersen and Renewal by Andersen products restrict the ability of the Plaintiffs and their owners, family members, and other personnel to trade or purchase from other suppliers any windows, doors, construction-related supplies including caulking, foam, trim, screws, cleaning products, and other construction-related materials in an attempt to lessen competition in the relevant markets in violation of 15 U.S.C. §14.

116.    The contractual provisions which Defendants required that Plaintiffs sign in order to carry the Andersen and Renewal by Andersen products restrict the ability of the Plaintiffs and their owners, family members, and other personnel from having any involvement with Andersen and Renewal products in an attempt to lessen competition in the relevant markets in violation of 15 U.S.C. §14.

117.    The Defendants' anti-competitive restrictions have damaged the Plaintiffs' business, as such the Plaintiffs have been injured and are entitled to their actual damages in an amount to be proven at trial.  Plaintiffs are further entitled to treble damages for such injuries, simple interest on their actual damages from the date of service of Plaintiffs' complaint until paid and Plaintiffs' attorney's fees and costs as provided by 15 U.S.C. §15(a).

**RENEWAL'S WRONGFUL TERMINATION OF ITS RELATIONSHIP**
**WITH DREAMSTYLE**

A.      **Defendants Breached the Retailer Agreements with Plaintiffs by**
        **Failing to Pay for Warranty and other Service Repairs to Defendants**
        **Customers**

118.    Under the retailer agreements, Plaintiffs are responsible to provide customer servicing of Defendants products for which Renewal agreed to pay and reimburse Plaintiffs the cost of providing such service.  Over the past year, Plaintiffs have provided such service at the request of Defendants and have billed for reimbursement.  Despite having timely submitted invoicing for such service, Defendants have refused and continue to refuse to pay Plaintiffs for such services.

119.    As of June 30, 2019, Renewal is indebted to Plaintiffs in excess of $30,000 which Defendants have failed to pay.  Such failure to pay constitutes a breach of contract entitling Plaintiffs to damages.

B.      **Defendants Breached the Retailer Agreements with Plaintiffs by**
        **Failing to Adhere to Pricing Terms and by Shipping Defective**
        **Products**

120.    Defendants have raised prices to Plaintiffs by failing to adhere to the pricing provisions of the Retailer Agreements.  Defendants raised prices by demanding changes to the payment provisions and discounts previously enjoyed by Plaintiffs for timely and prompt payment of invoices.  Historically, Plaintiffs paid Defendants' invoices within fifteen days, thus entitling Plaintiffs to a two percent (2%) prompt payment discount. According to the provisions of the Retailer Agreements, Plaintiffs could pay invoices on net thirty-day terms if they chose.  Without justification, Defendants accelerated the payment due dates for all invoicing and stopped shipments of new orders.

121.    Defendants also raised the cost of operation to Plaintiffs by continually shipping defective products which resulted in Plaintiffs having to incur significant additional administrative costs associated with inspection and segregating defective products, forcing Plaintiffs to incur additional costs in re-ordering corrective products, and in numerous instances forcing Plaintiffs to issue credits or payments to their residential home customers when the products supplied by Plaintiffs fail to meet the advertised specifications for quality and performance.

122.    Defendants raised the cost of operation to Plaintiffs by delaying shipment of product and by stopping shipment to Plaintiffs even for orders placed prior to the January 31, 2019 "termination" date.

123.    As described herein, Defendant Renewal gave Plaintiffs written notice of termination of the Retailer agreements on May 7, 2018 and again on October 29, 2018. Defendants also refused to extend the Northern Arizona agreement for an additional five years.  Although Tucson, New Mexico, and Idaho had contractual termination dates later in 2019 and through April 2022, Defendants have taken the position that the Retailer Agreements all terminated on January 31, 2019 – as much as 39 months earlier than allowed by the Retailer agreements.

124.    Beginning in November 2017 and continuing through 2019, Defendants unilaterally reduced quality of their products, especially the patio door products, sold to Plaintiffs.  Defendants reduced quality and increased their respective profits, by eliminating the quality assurance, quality control, and packaging procedures previously utilized thereby causing many more products to be damaged in transit and prior to delivery to Plaintiffs. Since November 2017, Defendants have failed to meet the quality specifications of the Retailer Agreements resulting in numerous product defects.  *See* Exhibit X – December 14, 2017 VP Junker Patio Door Defects Memorandum.   Upon information and belief,

Defendants have similarly reduced the quality of and packaging for their products sold to other affiliates and retailers within the Renewal network.

125.    To the extent the quality defects have adversely affected Plaintiffs' ability to sell and install products meeting the residential homeowner expectations,[3] Defendants' actions have had the practical effect of reducing the usable output of window and door products Defendants are contractually bound to provide to Plaintiffs.

126.    The quality defects have necessarily impaired the quality of windows and doors sold by Plaintiffs and by other affiliates or retailers, and by Defendants themselves, to the detriment of the consumers who ultimately buy them.

127.    Defendants product quality defects and resulting delays associated with re-ordering and re-shipment have caused damage to Plaintiffs reputation with its customers and have caused Plaintiffs to incur substantial additional expenses.

128.    When Plaintiffs complained about the ongoing quality defects, Defendants threatened to terminate the Retailer Agreements and in fact terminated all Retailer Agreements effective January 31, 2019.

129.    By breaching and terminating its Retailer Agreements with Plaintiffs, Renewal is effectively capitalizing on its superior market power forcing Plaintiffs to expend tens of millions of dollars in continued advertising and other increased costs so that Renewal can steal away the highly prized market areas and give them to other "favored" retailers within the Renewal network.

130.    Renewal's actual breach of its contracts with Plaintiffs, and its unlawful termination of those agreements (as described in more detail below), as well as completely

---

[3]    *See* e.g. Exhibit Y, January 5, 2019 Letter from Dreamstyle Customer Alexander Maller, Professor of Architecture, complaining of quality defects in the Andersen patio door products.

curtailing the supply of Renewal Products to Plaintiffs had the effect of restricting competition in the regional markets which are the exclusive territories of Plaintiffs.

131.    Due to Renewal's actions, Plaintiffs incurred millions of dollars investing in new samples, re-training of sales personnel, re-branding of vehicles and retail showrooms and buildings, re-training of technical personnel, and increased marketing expenses which are necessary to build and acquire an equivalent market share as a result of Renewal's breach and wrongful termination of the Four Retailer agreements.

132.    Plaintiffs have calculated that re-branding to sell another window or door manufacturer's product line will take between nine (9) to twenty-four (24) months at a cost of at least several hundred thousand dollars per month as well as other substantial capital investments and may still be subject to substantial uncertainties.

## C.    Defendants Wrongfully Terminated, Cancelled, or otherwise Wrongfully Refused to Extend the Four Retailer Agreements

133.    On May 7, 2018, Jeanne Junker, Vice President of Affiliate Retail Operations and Information Systems Center for Renewal by Andersen ("VP Junker"), flew 1,300 miles from Renewal's corporate offices in Cottage Grove, Minnesota to Albuquerque, New Mexico for a surprise meeting with Chavez.

134.    Over the past twelve years, VP Junker and other corporate officers and representatives from Renewal have been to Dreamstyle's corporate offices in Albuquerque nearly a dozen times so it was not uncommon for VP Junker to request a meeting with Chavez.

135.    While a visit from VP Junker was not uncommon, Plaintiffs found it odd that VP Junker requested an off-site location for the May 7, 2018 meeting, did not provide an agenda, and provided only two-days' notice.  When Chavez and his co-founder and wife, Joyce Hitchner, entered the meeting room, VP Junker opened the meeting by simply

advising that Renewal had decided to "terminate" all of the Retailer Agreements.   VP Junker then read from a prepared list of alleged contract violations by Dreamstyle.   At the end of the meeting, VP Junker then announced that Chavez and Dreamstyle would not even be permitted to sell the markets to another Renewal Affiliate – "the markets are not yours to sell!".

136.   As soon as VP Junker started reading from the list it was apparent to Chavez that the alleged "violations" were either entirely fabricated or that they constituted matters which were previously expressly approved by Renewal and therefore were not proper bases for termination.   Chavez attempted to protest the fact that, prior to Renewal's termination, Dreamstyle was never advised of the claimed violations, and was not provided any opportunity to respond to or cure any of the alleged breaches as required by paragraph ¶14 of the Retailer Agreements.

137.   As VP Junker was reading from the list Chavez attempted to respond, to either provide an explanation or in several instances to request a further clarification of the specific violation.   Each time, VP Junker would cut him off, telling him that "the decision has been made" and "nothing you say or do is going to change that."   VP Junker concluded the meeting by telling Chavez that the four markets "were not his to sell."

138.   The entire one-sided meeting ended 12 minutes later with VP Junker reading the last item on the list and then abruptly walking out the door for her five-hour return trip to her office in Cottage Grove, Minnesota – Renewal's corporate headquarters.

139.   Chavez has long since complained about the overt discrimination that VP Junker and other corporate representatives of Renewal have displayed against him.   Of the ninety-plus affiliate locations owned and controlled by nearly 50 different "ownership" groups, scant few are minorities.   Larry Chavez and the "Chavez Group" are one of those minority owners, being 100% Hispanic.

140.   Within the Renewal network of affiliates, Dreamstyle and the Chavez Group collectively represented one of the five largest ownership groups, behind only Esler Companies and Moore Holdings.  It was also well known that the largest affiliate group, Esler Companies, wanted to take over Dreamstyle's Tucson and Northern Arizona exclusive territories and had been orchestrating and colluding with Renewal and VP Junker to do that since early in 2017.[4]  Esler Companies already had the exclusive Phoenix territory and announced in early 2018 its plans to take over the entire State of Arizona.

141.   Unlike a similar situation in December 2018 whereby Renewal paid one of its favored affiliate groups, Moore Holdings, tens of millions of dollars to purchase back two under-performing market regions in California, Renewal unilaterally terminated Dreamstyle's agreements, as part of Renewal's scheme to steal them from Dreamstyle after they had been financed and developed by Dreamstyle.

142.   On May 8, 2018, VP Junker sent a letter enumerating the same nine items she presented in the May 7th meeting, in which she included the stated reasons for termination: (i) Marketing and selling Renewal by Andersen products outside of [Dreamstyle's] assigned Primary Market Area; (ii) Purchasing or starting businesses in the Primary Market Areas of other Renewal by Andersen retailers without informing [Renewal]; (iii) Selling or offering to sell competitive products in the Primary Market Area of other Renewal by Andersen retailers; (iv) Opening a Renewal by Andersen warehouse / office in Yuma, AZ without

---

[4]   Renewal permitted Esler Companies to purchase the premium "Phoenix" market in January 2017 for more than seven million dollars.  Despite having been in Northern Arizona and Tucson since 2009, the Chavez Group was not allowed to even bid or present a proposal to acquire the Phoenix market.  The awarding of the Phoenix market to Esler was done in strict violation of VP Junker's own policy which requires that adjoining territory owners (such as Chavez in Tucson and Northern Arizona) are to be given first opportunity to acquire new markets in the regions where they have existing presence.

[Renewal's] consent; (v) Selling or offering to sell competitive products to customers in [Dreamstyle's] Primary Market Area; (vi) [Dreamstyle's] handling of the Hageman matter[5], including disparagement of Andersen products; (vii) Failure to meet [Dreamstyle's] 2017 sales goals in four of [Dreamstyle's] four market areas and currently behind plan in Northern Arizona; (viii) Failure to meet [Dreamstyle's] 2018 Net Promoter score in San Diego and Tucson; and (ix) Recruiting or hiring employees from retailers in violation of our Integrity in Hiring[6] policy. *See* May 8, 2018 Letter attached as Exhibit F.

143.    As part of the May 7th meeting and May 8th letter, VP Junker also advised that Dreamstyle's executives and key personnel would be required to resign from the various Renewal affiliate councils and boards on which they served and that Dreamstyle's personnel would no longer be permitted to participate in on-line and in-person training programs or meetings which the Four Retailer agreements mandated that Dreamstyle attend.  "Effective immediately, you and your representatives are no longer invited to these meetings and other network meetings or training workshops."

144.    On May 8th, just a few hours after receiving Renewal's written termination, Dreamstyle prepared its initial response expressing shock. (*See* Exhibit G). Two days later, May 10, 2018, VP Junker sent a second letter, this time with the formal terms detailing the Renewal's termination, which Chavez responded to on May 17, 2018.  *See* Exhibits H and I respectively.

---

[5]    The "Hageman" matter involved a sale by Dreamstyle of several windows and doors to Wendy Hageman in Farmington, New Mexico.  The Hageman contract totaled approximately $60,000.  Renewal continued to ship defective products over the course of several months, making it difficult for Dreamstyle to complete the project to the homeowner's satisfaction.  *See* Exhibit W Listing of Defects in Andersen products supplied for Hageman project.

[6]    *See* Exhibit V – August 4, 2014 VP Junker Integrity in Hiring Memorandum.

145.    On May 17, 2018, Dreamstyle also requested that Renewal and its President, Paul Delahunt, provide further detailed explanation or documentation to support the alleged bases for termination.  It was not until two weeks later, June 1, 2018, that VP Junker sent a response which provided nothing in the way of evidentiary support, justification, or supplementation.  *See* Exhibits J and K respectively.

146.    Over the next several months, VP Junker continued to send threatening and demanding letters to Dreamstyle and Chavez.  Each letter contained statements similar to the following:

> This letter confirms that further violations of the terms of any of your [Dreamstyle's] Retailer Agreements, either of a type identified above or any other type, will not be tolerated.  Any further violations will be grounds for immediate termination.

*See* Exhibit F at pg 2.

> Per my letter of May 8, any additional DreamStyle (sic) breach of those agreements will jeopardize transition discussions and will be cause for immediate termination.

*See* Exhibit L – June 12, 2018 Letter from VP Junker.

147.    As stated above, the <u>Second Northern Arizona Agreement</u> had a term extending through January 31, 2019.  On July 17, 2018, in accordance with ¶41, Dreamstyle timely requested that the Agreement term be extended for an additional five years.  Renewal VP responded a week later rejecting Dreamstyle' request to extend.  *See* Exhibits M and N respectively.

> As indicated in my letter to you dated May 8, 2018, for the reasons identified in that letter and our subsequent correspondence and discussions, Renewal by Andersen will not be renewing the Retailer Agreement with Dreamstyle Remodeling for the Northern Arizona market area.

148.    After informing Dreamstyle that the <u>Second Northern Arizona Agreement</u>

would not be extended, VP Junker further advised that all five Retailer Agreements would be terminated with the same effective date – January 31, 2019 – and that Dreamstyle would be subject to an even earlier "termination" date, without prior notice or opportunity to cure, for even the most *de minimis* of alleged violations.

149.   In an effort to mitigate its damages[7] resulting from the wrongful termination of the agreements and to avoid Renewal's claim of further "breaches" or "violations," Dreamstyle requested that it be permitted to mitigate its damages by (i) establishing a bath operation in Boise, Idaho; (ii) begin selling non-Renewal window and door products in and around Los Angeles, California; and (iii) staggering the termination dates for each of the markets from January 31, 2019 to a more reasonable period extending to April 30, 2019. Renewal refused.

150.   Renewal rejected Dreamstyle's efforts at mitigation unless Dreamstyle signed an agreement waiving all its claims for damages.  On October 29, 2018, Renewal sent formal notice that the Retailer Agreements for New Mexico, Tucson, and Northern Arizona would all terminate upon expiration of the Northern Arizona Agreement, effective January 31, 2019.  Renewal further claimed that it was electing to formally terminate the San Diego and Boise agreements "for cause" with a termination date of January 31, 2019 with no explanation as to the reasons why and with no opportunity for Dreamstyle to cure any alleged deficiencies or "breaches."  *See* Exhibit U.

151.   Prior to the termination, Renewal gave Dreamstyle no notice or opportunity to

---

[7]     From mid-September 2018 to early October 2018, there were numerous efforts by Dreamstyle attempting to mitigate its damages – all of which were rejected by Renewal. *See* Exhibit O – September 6, 2018 Dreamstyle letter; Exhibit P- September 17, 2018 Chavez e-mail; Exhibit Q; September 18, 2018 letter from VP Junker "sale of other products not permitted"; Exhibit R, September 19, 2018 Letter from Dreamstyle; and Exhibits S & T – Dreamstyle's October 2, 2018 proposed termination agreement.

cure any of the alleged non-specific violations.  Renewal has had actual notice of the claimed violations for years, said nothing, and has granted Dreamstyle additional territories or otherwise renewed the agreements with these alleged "violations" already in place.

152.    It was only after Esler Companies announced its desire to acquire Dreamstyle's Arizona territories to fuel their own growth that Renewal chose to fabricate the claimed violations.  It was only after Dreamstyle had invested tens of millions of dollars in marketing and building the customer database on the Enabled+ CRM database, controlled by Renewal, that Renewal elected to justify its termination.

153.    Renewal's termination was based on a fabrication of lies created as part of its overall strategy for illegally terminating Dreamstyle and further engaging in anti-competitive behaviors.

154.    Renewal and VP Junker's, motive for termination was clear (i) its desire to maintain its monopoly position and closely control its retailer affiliates by ensuring that no competing brands or non-window or door products are marketed or sold to customers.  (ii) to crush the Chavez Group and "clean up" the Renewal network by eliminating the largest minority group; (iii) punishing Chavez and Dreamstyle for hiring several high ranking former employees of Esler Companies;[8] (iv), as a way to reward the Renewal's "favored" affiliates, Esler Companies and others, by presenting them with the exclusive territories that have been established and developed through the capital investments, marketing expertise, and strong business practices of Dreamstyle; and (v) to silence Chavez and Dreamstyle from making their ongoing complaints about the frequent and on-going manufacturing defects

---

[8]    In late 2017 and early 2018, Dreamstyle hired one current and two former high-ranking employees of Esler.  Dreamstyle and Chavez were chastised by VP Junker and Esler in a conference call, and shortly thereafter Dreamstyle was terminated.  When Chavez wanted to hire Dreamstyle General Manager Kenneth Biddle in May 2016, VP Junker objected and told Chavez that he could do so "over [her] dead body."

and the poor quality of Andersen doors and Renewal by Andersen windows being delivered to Dreamstyle.[9]

D.     **Plaintiffs Have Invested Tens of Millions of Dollars Promoting Renewal**

155.    Between January 2014 when the Second Northern Arizona Agreement was executed and October 2018, Dreamstyle has invested approximately thirty-four million dollars ($34,000,000) directly marketing the Renewal brand – approximately $700,000 every month.[10] Added to this direct marketing expense are other substantial capital improvement expenditures mandated by Renewal: (i) design and construction of four showrooms of "Renewal Products" ($350,000+)[11]; $180,000+ spent on wrapping more than 50 cars, trucks, trailers and wagons with Renewal specific logos and advertising; $4,000,000+ in direct training expenses for sales representatives, installers, installation and production; IT and systems integration ($100,000+); monthly fees paid to Renewal for its proprietary customer relationship management system ("CRM") Enabled+ ($18,000/year); and Renewal specific call center expenses ($75,000 / month).

---

[9]    Since December 2017, Chavez and other Dreamstyle production managers and quality control personnel have continued to complain to Renewal about the product delivery delays, incomplete shipments, and manufacturing defects in the Andersen doors and Renewal windows being delivered to Dreamstyle.  Through 2018, Dreamstyle calculates that 20 to 25% of all ordered are delivered with some sort of material defect, preventing their installation in customers' residences.  Current customer reports of ongoing defective Renewal products proliferate the internet and Defendants' affiliate websites.

[10]    2014 - $2,997,000; 2015 - $6,330,000; 2016 - $7,800,000; 2017 - $8,047,000, and 2018 - $8,763,000.

[11]    This figure does not include acquisition costs for the showrooms or buildings, such as rent or lease payments, utilities, or cost of manning the showrooms.  The figure listed relates solely to the cost to purchase and build the specific product displays.

156.    Dreamstyle has invested these tens of millions of dollars with the reasonable expectation that its exclusive rights to market and sell the Renewal Brand projects would not be unfairly or unreasonable controlled or unilaterally terminated by Defendants.

157.    Dreamstyle has invested these tens of millions of dollars with the reasonable expectation that each of the Four Retailer Agreements which form the subject matter of this litigation would be renewed in successive five-year increments.

158.    The substantial investment by Dreamstyle of both traditional and non-traditional marketing has its obvious benefits to Renewal in the form of year after year business growth and a market share[12] for the Renewal Products in each of Dreamstyle's four exclusive territories which is substantially higher than the majority of other Renewal affiliates for the territories that they represent.[13]

159.    In addition to Market Share, Dreamstyle has through the expenditure of substantial training and good business practices, developed substantial goodwill for the benefit of Renewal.  On average, more than 10% of each year's sales of Renewal Products by Dreamstyle is in the nature of repeat customers who return to either continue with and complete previous home remodeling projects or who as a result of purchasing a new home, desire to purchase the Renewal Products again from Dreamstyle.

160.    Advertising and goodwill paid for by Dreamstyle has a long-standing impact and historically has generated sales years in the future.  The frequent and varied marketing

---

[12]    "Market Share" represents the percentage of an industry or market's total sales that is earned by a specific manufacturer.  For example, in 2016 Renewal issued a national market share report showing Dreamstyle's Albuquerque Market Share in the replacement window and door market was more than 10% (one out of every ten replacement windows sold in Albuquerque was a Renewal window) as a direct result of Dreamstyle's substantial marketing efforts.

[13]    Average Renewal network Market Share is only 3.2%.  Dreamstyle's Market Share is more than three times the affiliate average.

by Dreamstyle for Renewal within its exclusive territories creates what is referred to as brand awareness.  Because of this brand awareness, Dreamstyle has hundreds of examples where marketing dollars spent will eventually result in a Renewal sale as much as 10 years later.

161.   In the twelve-plus years that Dreamstyle had been a Renewal affiliate, Dreamstyle has also spent millions of dollars building and maintaining "customer" or "prospect" databases of hundreds of thousands of potential leads acquired via its traditional and non-traditional marketing efforts.  These customer databases contain customer names, property addresses, product interests, phone numbers, e-mail addresses, and customer budgets.  They have a tremendous value to Dreamstyle and are specific to both the specific exclusive territories which Dreamstyle has been issued and also include customer names for other territories / free zones.  Dreamstyle's cost to generate each prospect averages $190.  Presently, Dreamstyle's customer/prospect databases contain more than 165,500 leads and have an estimated value of thirty-one to forty-eight million dollars[14] ($31,496,000 to $48,495,000).

E.   **Dreamstyle Has Been Damaged by the Wrongful Termination and Illegal Take-over of its Exclusive Territories, Customers, and Loss of Goodwill and Interruption to its Business Operations**

162.   Each of the Four Retailer Agreements and the exclusive territories which they represent has substantial value.  In 2017, the sale of Renewal Products represented nearly forty-three million dollars in revenue to Plaintiffs and comprised 65% of Plaintiffs total business volume.  In 2018, from the four markets, Dreamstyle achieved forty-eight million

---

[14]   $31,496,000 represents the cost to generate the prospect database.  $48,495,000 represents the stream of revenue that Dreamstyle would receive from those prospects. *See* fn 2 *infra*.

dollars in revenue from Renewal products[15] of which Dreamstyle realized a 15% average profit margin.

163.    Based on its historical earnings and profits, Dreamstyle calculates the business volume of these four exclusive territories over their original terms to exceed two hundred million dollars.

164.    The termination of the agreements causes a loss to Dreamstyle not only of their future value but also results in further damages as well.

165.    Historically, Dreamstyle realizes a substantial repeat customer business of thirteen percent (13%) of total annual revenue.  Lost profits and business opportunities from this loss of repeat customers is reasonably estimated to exceed three million dollars.  Had Dreamstyle been allowed to continue with its business operations selling Renewal Products for just another three years, Dreamstyle would have realized these profits.

166.    Historically, Dreamstyle realizes a substantial amount of new customer business resulting from brand recognition and legacy advertisements[16] of fifteen percent (15%) of total annual revenue.  Lost profits and business opportunities from this loss of new legacy customers is reasonably estimated to exceed four million dollars.  Had Dreamstyle been allowed to continue with its business operations selling Renewal Products for just another three years, Dreamstyle would have realized these profits.

167.    Dreamstyle has previously invested over a million dollars in promoting the

---

[15]    The termination demoralized Dreamstyle's staff making them fearful of their job future and security thereby inhibiting their performance.  At a leadership level, the termination diverted significant resources away from driving Renewal business growth as it was imperative to identify and plan for transitioning to a new window and door manufacturer

[16]    Dreamstyle has achieved sales from legacy (prior-year) advertising dating as far back as 10+ years and routinely receives sales from legacy advertising in the 3 to 4-year range.

Renewal Brand through showroom displays, promotional materials, presentation software, signage, vehicle wraps, etc.  By wrongfully terminating the Retailer Agreements, Renewal is attempting to illegally reap what Dreamstyle has sown.  As a direct result of the terminations, all these previous capital expenditures were lost resulting in damage to Dreamstyle.

168.    During its twelve-year span Dreamstyle earned thousands of five-star positive on-line reviews for its sales, installation, and customer service.  Dreamstyle also earned numerous Renewal Customer Satisfaction awards and the exclusive "Green Diamond" award for exceptional customer service from Renewal.

169.    Following the wrongful termination, Renewal authorized the replacement affiliates to take over Dreamstyle's positive reviews and customer comments on Google, the Better Business Bureau, Facebook, and other on-line social media sites and use them in their own digital on-line advertising. [17] Despite Plaintiffs' objections and protests, Defendants are aware of, consented, and have actively promoted the theft of Plaintiffs' online reviews, awards, and positive business reputation by the replacement affiliates and by Renewal itself.

170.    Dreamstyle calculates that the direct cost of re-branding itself, creating new customer reviews, and launching with a new window and door manufacturer will exceed two million dollars.

171.    Dreamstyle calculates that in the first year of operation and in having to market and establish a new brand recognition in the marketplace, costs will exceed three million dollars, and Dreamstyle has been damaged to that amount.

---

[17]    *E.g.*, as of November 15, 2019, Renewal by Andersen of Boise uses more than 600 of Dreamstyle Remodeling of Idaho LLC's online customer reviews in its digital website; Renewal by Andersen of New Mexico, and Renewal by Andersen of Tucson each collectively use more than of 1,000 Dreamstyle Remodeling Inc.'s online customer reviews in their digital websites and advertising.

172.    Dreamstyle calculates that the loss of its customer database comprising more than 165,500 prospects, each of which cost an average of $190 to acquire and develop, to be more than $31,495,000.    Renewal wrongfully seized control of and has deprived Dreamstyle of the use and benefit of these prospects.    Subsequent to wrongfully taking control of Dreamstyle's prospect database, Defendants utilized the information therein to promote their own products, and to promote their new affiliate groups who ceased control over the Market areas previously owned by Dreamstyle.    Dreamstyle has been damaged to by the value of its prospect database.

173.    Dreamstyle calculates that in the months following Renewal making public its termination of Dreamstyle's four markets, there has been a loss of productivity, direct loss of sales, and negative impact on basic operational functions of the business; that, plus the cost of transitioning to new product lines totals more than four million dollars.    Dreamstyle has been damaged to that amount.

**F.    Renewal Intentionally Interfered with Numerous Business Opportunities and Third-Party Agreements of Dreamstyle**

174.    Almost immediately following the May 7th meeting where VP Junker advised of Renewal's decision to wrongfully terminate the Retailer Agreements, Renewal and its corporate executives have engaged in a pattern and scheme to destroy and defame Dreamstyle and Chavez.

175.    In numerous phone conversations between VP Junker and Chavez starting in early 2018, VP Junker has used the common phraseology that Dreamstyle / Chavez and Renewal are "not aligned."    Time and again VP Junker has objected to Chavez promoting his own Dreamstyle[18] branding.

---

[18]    In April 2017, Chavez acquired the naming rights to the Football and Basketball stadium for the University of New Mexico Lobos.    UNM Basketball "The Pit" has been

Figure 3 – Dreamstyle Remodeling Mark.



176.    After Chavez committed $10 million dollars to acquire the naming rights from the University of New Mexico, VP Junker chastised Chavez for building his own "Dreamstyle" brand and investing in the local community instead of spending the same $10 million dollars promoting the "Renewal" brand.  Renewal has repeatedly voiced objection to Chavez starting an entirely separate business operating in Denver, Colorado where Dreamstyle sells Kohler brand bath products[19].

177.    Not being "aligned" with Renewal and Andersen comes at a significant cost and that price is extracted by gatekeeper and enforcer, VP Junker.  Despite being one of the top selling ownership groups[20] within the Renewal network of affiliates, Chavez was specifically excluded from attending the "Owner" meetings afforded by Renewal to the other non-Hispanic owners.

178.    Other examples of discrimination or not being "aligned" include (i) the instance where Renewal's marketing agency "Lead Surge" claimed that Dreamstyle had infringed on their copyright for a Renewal ad campaign.  With Dreamstyle and Chavez,

---

renamed "Dreamstyle Arena," and UNM Football field has been renamed "Dreamstyle Stadium."

[19]    The Esler Companies is the Renewal affiliate selling in the Denver market.  VP Junker has informed Chavez that "she is not happy with" Dreamstyle being in the same market area as her "#1 affiliate."

[20]    Renewal Products represent approximately 65% of Dreamstyle's net sales from all of its various remodeling product lines.

Renewal demanded that Chavez pay a $50,000 "settlement," yet in an identical instance involving a non-Hispanic owner, VP Junker intervened and directed Lead Surge to dismiss the claim; (ii) Renewal regularly hosts social events for Owners and top managers to which Chavez is never invited; (iii) since 2012, the "Owner Affiliate Council" – a select group of 8 to 10 Owners – had frequent openings and yet Chavez has never been offered a position.  In 2017, the position was given to new non-Hispanic affiliate owner who was underperforming in his market; (iv) in the 12 years Chavez had been a Renewal affiliate owner – representing markets with double digit year after year growth – he was never once offered one of the prized "Owner Affiliate Council" seats, nor was he invited to participate on any other council or committee; (v)  Chavez was also never nominated for and received any award at Renewal's annual awards galas.  VP Junker controls who can participate in these prestigious groups, councils, and committees.

179.    After receiving Renewal's May 8, 2018, letter advising of the impending termination, with Renewal's permission, Chavez began to actively seek an alternative supplier of window and door products.  One of those alternative suppliers was ProVia. When Dreamstyle contacted ProVia, Dreamstyle quickly discovered that Renewal had expressly prohibited ProVia from providing any product information or pricing for window and door products to Dreamstyle.

180.    In June 2018, Chavez reached out to the Esler Companies about Dreamstyle selling its Tucson and Northern Arizona Markets.   Esler expressed interest in these markets[21] – essentially taking over the entire state of Arizona – and in early August 2018,

---

[21]    Matt Esler, one of the two principals for the Esler Companies had expressed his desire to acquire the Tucson and Arizona markets in mid-April 2018.  Chavez advised Esler that he was not interested in selling at that time.  Not surprisingly, just three weeks later VP Junker flew to Albuquerque for her 12-minute meeting advising Chavez of Renewal's decision to terminate Dreamstyle.

Esler agreed to purchase the markets from Dreamstyle for $7.0 million dollars cash with a closing date of September 30, 2018.

181.   On September 4, 2018, Renewal let it be known to Esler that Renewal had already advised Dreamstyle that they were terminating the Tucson and Northern Arizona retailer agreements effective October 1, 2018 (*See* Exhibit H).   The following day, Esler notified Dreamstyle that it was cancelling the $7.0 million-dollar purchase agreement.   In December 2018, Esler publicly announced that Renewal "awarded" them Dreamstyle's Tucson and Northern Arizona markets.

182.   Due to the intentional interference by Renewal with Dreamstyle's sale of the Northern Arizona and Tucson markets in September 2018, Dreamstyle directly lost $7,000,000, and Dreamstyle has been damaged to that amount.

183.   Earlier in August 2018, Dreamstyle also learned that a top executive at Andersen / Renewal had informed Kohler's[22] top management that Renewal had "terminated" Dreamstyle and that Chavez and Dreamstyle were "not a trustworthy partner." After this comment was made, Kohler sent a director and three other executives to investigate whether Chavez and Dreamstyle could be trusted to continue to do business with Kohler.   Chavez brought this to VP Junker's attention, but she refused to take any action to correct the disparagement.

184.   Following Renewal's announcement of the termination of Dreamstyle, Renewal and VP Junker have actively promoted the direct poaching[23] of Dreamstyle's

---

[22]   Kohler is Dreamstyle's business partner for Kohler bath products, which Dreamstyle sells in its Denver, Phoenix, and Tucson markets.   Dreamstyle's Kohler bath sales represent $13,569,000 through September 2018.

[23]   On October 24, 2018, Dreamstyle requested that Renewal stop these activities by its affiliate groups (which was a direct violation of the Integrity in Hiring memorandum that Dreamstyle was accused of violating).   VP Junker and Renewal refused to take any

employees, installation technicians, sales personnel, and management personnel by what Renewal has identified as the successor affiliates, Esler Companies, and the Tiffee Group.

185.    Since May 2018, VP Junker and/or other Renewal executives have been actively contacting third parties and advising them that Dreamstyle had been "terminated" causing substantial damages to Dreamstyle's business reputation and ability to compete in its various markets.

186.    In December 2018, Renewal contacted Dreamstyle's direct mail marketing company, Premier Direct Marketing, with whom Dreamstyle spends more than two hundred thousand dollars monthly and forced them to sign an agreement which specifically prevented Premier from acting as Dreamstyle's vendor.   According to Premier such a request is unprecedented in the direct mail marketing business.   Mailing houses such as Premier routinely act as a common vendor for national competing brands (e.g. Pizza Hut and Papa John's).

187.    Other than to crush and damage Dreamstyle and further Renewal's monopolistic goals, such a restraint on trade has no legitimate business goal.

188.    Even prior to the May 7, 2018 meeting, Renewal and VP Junker have actively interfered with Dreamstyle's business operations: (i) Renewal directed Dreamstyle to fire its general manager in Tucson; (ii) Renewal directed Dreamstyle to close down its Tucson call center operation; (iii) in January 2018, Renewal directed Dreamstyle to appoint a new Proximity Manager for its Tucson operation; and (iv) in early 2018, Renewal took over the Hageman project and directly cancelled the Sales Agreement that Dreamstyle had with that customer causing Dreamstyle to lose more than $60,000 in revenues; (v) Renewal requires that Dreamstyle and all other affiliates subscribe to and utilize Renewal's proprietary Enabled+ software and to assign all customer prospects, regardless of source to Renewal;

---

action.

(vi) Renewal required Dreamstyle to participate in and pay for Renewal advertising programs.  The list of Renewal's direct interference with the day-to-day business operations is replete with other similar Renewal mandates.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF SHERMAN ACT SECTION 1 (CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE

189.   Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 188 as if restated herein in its entirety.

190.   Beginning on or before May 2017, Defendants entered into and engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

191.   Defendants engaged in predatory and anti-competitive behavior by restricting competition among its corporate owned stores and retailers, which unfairly suppressed employee wages, and unreasonably restrained trade.

192.   Defendants' conduct included concerted actions and undertakings among the Defendants' corporate stores and retailers with the intent, purpose and effect of:

a.   artificially suppressing the compensation of retailer employees;

b.   eliminating competition among Defendants and retailers for skilled labor; and

c.   restraining employees' ability to secure better compensation, advancement, benefits, and working conditions.

193.   Defendants contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

**COUNT II:**

**VIOLATION OF SHERMAN ACT SECTION 2**

**(UNLAWFUL MONOPOLIZATION)**

194.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 193 as if restated herein in its entirety.

195.    Defendant's conduct constitutes the intentional and unlawful maintenance of monopoly power in the relevant product market, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

196.    For the purpose of maintaining their monopoly power, Defendants committed numerous acts, including:

       a.    Forcing Dreamstyle to agree to an exclusive dealing arrangement pursuant to which only Renewal window and door products may be sold by Retailers;

       b.    Penalizing Dreamstyle for recognizing consumer demands for alternative brands and/or complementary window and door or other products by terminating Dreamstyle's retailer agreements;

       c.    Using its market position to force other third-party vendors with whom Dreamstyle has existing contractual relationships to terminate their relationships with Dreamstyle, forcing Dreamstyle to find alternative third-party vendors and ultimately resulting in a price increase to consumers.

197.    By engaging in these exclusionary behaviors, Renewal has deprived consumers of the benefits of competition among suppliers of replacement windows and doors.

198.    Renewal does not have a legitimate business purpose for any of its anti-competitive conduct, and any assertion that a procompetitive benefit exists is meritless. Renewal's behavior does not result in any cost reduction nor does it promote innovation or

access to products by consumers.  Moreover, Renewal's behavior does not reduce the high entry barriers in any way.

199.    Renewal's unlawful monopolization in the relevant product market suppressed sales of competing products and ultimately increased consumers costs.

200.    Renewal's overall conduct has and will continue to maintain supra-competitive prices to consumers in the relevant product market, harm innovation, and otherwise deny consumers the choice of replacement windows and doors on the merits.

## COUNT III:

## VIOLATION OF SHERMAN ACT SECTION 2

## (ATTEMPTED MONOPOLIZATION)

201.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 120 as if restated herein in its entirety.

202.    Renewal acted with a specific intent to monopolize and to destroy competition in the relevant product market. Renewal devised and implemented a play to systematically eliminate competition in the relevant product market.

203.    Renewal willfully engaged in a course of exclusionary conduct to obtain a monopoly in the relevant product market; including:

a.    Forcing Dreamstyle to agree to an exclusive dealing arrangement pursuant to which only Renewal window and door products may be sold by Retailers;

b.    Penalizing Dreamstyle for recognizing consumer demands for alternative brands and/or complementary window and door or other products by terminating Dreamstyle's retailer agreements;

c.    Using its market position to force other third-party vendors with whom Dreamstyle has existing contractual relationships to terminate their relationships with Dreamstyle, forcing Dreamstyle to find alternative third-party vendors and ultimately

resulting in a price increase to consumers.

d.    Defendants have engaged in a systematic and deliberate process to cause third-party marketing vendors such as Premier Direct Marketing, BombBomb / Deo Volente, and Nina Hale to cease doing business with Plaintiffs.  Defendants have also attempted to influence third party suppliers such as Kohler and ProVia to not do business with Plaintiffs.

204.    Renewal does not have a legitimate business purpose for any of its anti-competitive conduct, and any assertion that a procompetitive benefit exists is meritless. Renewal's behavior does not result in any cost reduction nor does it promote innovation or access to products by consumers.  Moreover, Renewal's behavior does not reduce the high entry barriers in any way.

205.    Throughout the time Renewal engaged in this exclusionary conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling in the relevant product market and excluding its competitors.

206.    Renewal's unlawful monopolization in the relevant product market suppressed sales of competing products and ultimately increased consumers costs.

207.    Renewal's overall conduct has and will continue to maintain supra-competitive prices to consumers in the relevant product market, harm innovation, and otherwise deny consumers the choice of replacement windows and doors on the merits.

## COUNT IV:

## THE EXCLUSIVITY CLAUSE OF THE RETAILER AGREEMENTS VIOLATE SECTION 3 OF THE CLAYTON ACT

208.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 207 as if restated herein in its entirety.

209.    Defendants required that in order for a company to become an "affiliate"

offering the Andersen and Renewal by Andersen products, that any company looking to contract with Defendants sign a contract which requires that the company may only sell Renewal and Andersen products and they can be terminated if they carry or sell any competitor products.

210.   Defendants required that in order for a company to become an "affiliate" offering the Andersen and Renewal by Andersen products, that any company looking to contract with Defendants sign a contract which requires that the company may only purchase construction related materials from manufacturers, distributors, and suppliers from specified suppliers and distributors and they can be terminated if they purchase from non-approved Andersen / Renewal vendors, suppliers, or manufacturers.

211.   Defendants required that in order for a company to become an "affiliate" offering the Andersen and Renewal by Andersen products, that any company looking to contract with Defendants sign a contract prohibiting Plaintiffs, its owners, immediate family members, directors, officers and all management level employees, for a period of five (5) years from becoming affiliated with any other company engaged in the sale, promotion, installation or servicing of window and door products manufactured by Andersen.

212.   The contractual provisions which Defendants required that Plaintiffs sign in order to carry the Andersen and Renewal by Andersen products restrict the ability of the Plaintiffs and their owners, family members, and other personnel to trade or purchase from other suppliers any windows, doors, construction related supplies including caulking, foam, trim, screws, cleaning products and other construction related materials in an attempt to lessen competition in the relevant markets in violation of 15 U.S.C. §14.

213.   Within the meaning of Section 4 of the Clayton Act, 15 U.S.C. §15, Plaintiffs have been injured in their business or property by reason of the lessening of competition described above, including without limitation Defendants refusal to supply to Plaintiffs

except on anticompetitive terms and conditions and Defendants wrongful efforts to accelerate termination of the Four Retailer Agreements.

214.    The actions of the Defendants tend to lessen competition and to increase Defendants monopoly power.

215.    The Defendants anti-competitive restrictions have damaged the Plaintiffs business, as such the Plaintiffs have been injured and are entitled to their actual damages in an amount to be proven at trial.  Plaintiffs are further entitled to treble damages for such injuries, simple interest on their actual damages from the date of service of Plaintiffs complaint until paid and Plaintiffs' attorney's fees and costs as provided by 15 U.S.C. §15(a).

216.    The Defendants anti-competitive restrictions and violation of the antitrust laws have damaged the Plaintiffs business and Defendants' continuing conduct will cause further threatened loss and damages to Plaintiffs.  There is a danger of irreparable loss and the damage to Plaintiffs is immediate.  Plaintiffs are entitled to injunctive relief as provided by Section 16 of the Clayton Act, 15 U.S.C. §26.

## COUNT V

## VIOLATIONS OF THE ARIZONA ANTITRUST ACT

217.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 216 as if restated herein in its entirety.

218.    Defendants' acts of conspiracy and unreasonable restraint of trade and commerce had the purpose and effect of suppressing competition in the sale of windows, doors, construction-related materials, spas, sunrooms patio rooms, kitchen and bath remodeling components and general residential home remodeling in the State of Arizona and elsewhere, and had a substantial and adverse impact on prices for windows, doors, construction-related materials, spas, sunrooms patio rooms, kitchen and bath remodeling

components and general residential home remodeling in Arizona. Defendants' acts have caused substantial injury and damage to Plaintiffs.

219.    The above described actions by Andersen and Renewal are wrongful and constitute violations of the Arizona Antitrust Act, Ariz. Rev. Stat. Ann. §44-1401 to §44-1416. Defendants' actions also constituted an intentional attempt to monopolize window and door and other types of home remodeling commerce in the State of Arizona.

220.    Defendants' actions were knowingly, intentionally, and flagrantly made with the intention to unreasonably restrict trade and commerce in the State of Arizona.

221.    Plaintiffs have been damaged by Defendants' violations of the Arizona Antitrust Act. Plaintiffs are entitled to injunctive relief and are entitled to actual damages in the minimum amount of fourteen million dollars ($14,000,000) together with their taxable costs and attorney's fees as provided by Ariz. Rev. Stat. Ann. §44-1408(B). Plaintiffs are further entitled to treble their actual damages as provided by Ariz. Rev. Stat. Ann. §44-1408(B).

## COUNT VI

## VIOLATION OF THE IDAHO COMPETITION ACT

222.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 221 as if restated herein in its entirety.

223.    Defendants' acts of conspiracy and unreasonable restraint of trade and commerce had the purpose and effect of suppressing competition in the sale of windows, doors, construction-related materials, spas, sunrooms patio rooms, kitchen and bath remodeling components and general residential home remodeling in the State of Idaho and elsewhere, and had a substantial and adverse impact on prices for windows, doors, construction-related materials, spas, sunrooms patio rooms, kitchen and bath remodeling components and general residential home remodeling in Idaho. Defendants' acts have

caused substantial injury and damage to Plaintiffs.

224.   The above described actions by Andersen and Renewal are wrongful and constitute violations of the <u>Idaho Competition Act,</u> Idaho Code Ann. §48-101 to §48-118.

225.   Defendants' actions also constituted an intentional attempt to monopolize window and door commerce in the State of Idaho.  Defendants' actions were knowingly, intentionally, and flagrantly made with the intention to unreasonably restrict trade and commerce in the State of Idaho.

226.   Plaintiffs are entitled to relief under the Idaho Competition Act, Idaho Code Ann. §48-101 *et seq.*, including restitution, injunctive relief, civil penalties and reasonable costs and attorneys' fees.

227.   Plaintiffs have been damaged by Defendants violations of the <u>Idaho Competition Act</u> and are entitled to actual damages in the minimum amount of four million dollars ($4,000,000) together with their taxable costs and attorneys' fees and treble their actual damages as provided by Idaho Code Ann. §48-113.

## COUNT VII

## VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT

228.   Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 227 as if restated herein in its entirety.

229.   Defendants' acts of conspiracy and unreasonable restraint of trade and commerce had the purpose and effect of suppressing competition in the sale of windows, doors, construction-related materials, spas, sunrooms patio rooms, kitchen and bath remodeling components and general residential home remodeling in the State of New Mexico and elsewhere, and had a substantial and adverse impact on prices for windows, doors, construction-related materials, spas, sunrooms patio rooms, kitchen and bath remodeling components and general residential home remodeling in New Mexico.

Defendants' acts have caused substantial injury and damage to Plaintiffs.

230.   Defendants' acts violate, and Plaintiffs are entitled to relief under the New Mexico Unfair Practices Act, N.M. Stat. Ann. §57-1-1 to §57-1-19.  Plaintiffs are entitled to rescission of the Retailer Agreements and contracts, treble damages, injunctive relief and reasonable attorneys' fees under the New Mexico Unfair Practices Act, Section 57-1-3,

231.   Defendants' actions also constituted an intentional attempt to monopolize window and door as well as other commerce in the State of New Mexico.

232.   Defendants' actions were knowingly, intentionally, and flagrantly made with the intention to unreasonably restrict trade and commerce in the State of New Mexico.

233.   Plaintiffs have been damaged by Defendants' violations of the New Mexico Unfair Practices Act and are entitled to actual damages in the minimum amount of seventeen million dollars ($17,000,000) together with their taxable costs, attorneys' fees, and threefold their damages as provided by N.M. Stat. Ann. §57-1-3.

## COUNT VIII

## VIOLATION OF THE FEDERAL FRANCHISE RULE

234.   Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 233 as if restated herein in its entirety.

235.   The business ventures sold by Andersen are franchises, as "franchise" is defined in Sections 436.1(h) of the Franchise Rule, 16 C.F.R. §436.1(h).

236.   The Franchise Rule requires a franchisor to provide prospective franchisees with a complete and accurate disclosure document containing twenty-three categories of information, including information about the litigation and bankruptcy history of the franchisor and its principals, the terms and conditions under which the franchise operates, and information identifying existing franchisees.  16 C.F.R. §436.2 and 436.5.

237.    In connection with the offering of franchises, Andersen violated the Franchise Rule by failing to provide Plaintiffs with accurate and complete disclosure documents as prescribed by the Franchise Rule.

238.    Plaintiffs are entitled to rescission of the Four Retailer agreements, rescission of the Renewal Enabled+ agreement, for an injunction prohibiting Defendants from using, distributing, or otherwise providing any of Dreamstyle's prospect / customer database information to any other Renewal or Andersen affiliate or retailer.

239.     Plaintiffs are further entitled to all of their damages including but not limited to Loss of Business Value, Loss of Profits, Loss of their on-line reviews Re-branding Expenses, Loss of Productivity, Loss of Customer Database and the other damages enumerated *infra* in an amount of no less than sixty-million dollars ($60,000,000) together with Plaintiff's attorneys' fees and costs of suit.

## COUNT IX

## VIOLATION OF MINNESOTA FRANCHISE ACT

240.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 216 and 234 to 239 as if restated herein in its entirety.

241.    The Retailer Agreements, contracts, and other agreements and arrangements between Dreamstyle and Renewal constituted a franchise in which Dreamstyle has specific rights and to which Renewal has specific obligations.

242.    The relationship between Plaintiffs and Defendants is a "franchise" within the meaning of the Minnesota Franchise Act.  Minn. Stat. Ann. §80C.01 et seq.

243.    As a franchisor, dealing with more than a billion dollars in goods and commodities sold in interstate commerce throughout the United States, Renewal was required to comply with specific disclosure and registration requirements under the Minnesota Franchise Act, Minn. Stat. Ann. §80C.01 et seq.

244.    Defendants violated Minn. Stat. Ann. §80C.02 by offering and selling to Plaintiff a franchise that was not registered as required under the provisions of the <u>Minnesota Franchise Act</u>.

245.    Defendants' conduct also constitutes a violation of Minn. Stat. Ann. §80C.13, Subd. 2, which provides "[n]o person may offer to sell a franchise in this state by means of any written or oral communication which includes an untrue statement material fact or which omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

246.    Prior to entering into the franchise relationship, Defendants also failed to adequately and sufficiently disclose to Plaintiffs the business terms of the relationship including the terms and conditions regarding non-renewal and termination of the franchise agreement.

247.    Plaintiffs are entitled to rescission of the four Retailer agreements which are the subject matter of this litigation, rescission of the Renewal Enabled+ agreement, for an injunction prohibiting Defendants from using, distributing, or otherwise providing any of Dreamstyle's prospect / customer database information to any other Renewal or Andersen affiliate or retailer.  Plaintiffs are further entitled to all of their damages including but not limited to Loss of Business Value, Loss of Profits, Loss of their on-line reviews, Re-branding Expenses, Loss of Productivity, Loss of Customer Database and the other damages enumerated *infra* in an amount of no less than sixty-million dollars ($60,000,000) together with Plaintiff's attorneys' fees and costs of suit.

## COUNT X

## VIOLATION OF MINNESOTA UNFAIR PRACTICES STATUTE

248.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 216 and 234 to 247 as if restated herein in its entirety.

249.    The Minnesota Unfair Practices Statute, Minn. Stat. §80C.14, Subd. 4, prohibits the termination or cancellation of the franchise relationship unless the franchisor provides written notice of all the reasons for termination or cancellation at least ninety (90) days' notice of the intent to terminate; and the franchisee fails to correct the stated reasons within sixty (60) days of the notice.

250.    Defendants, in violation of Minn. Stat. §80C.14, Subd. 4, did not provide the required notice and cure period to Plaintiffs.  Despite written notice and demand, Defendants failed to provide with specificity the reasons for termination.  To the extent notice was provided by Defendants it was deficient or not provided in a timely manner sufficient for Plaintiffs to have corrected or addressed the alleged bases for termination.

251.    Renewal never provided Dreamstyle with reasonable notice or opportunity to cure any of the alleged "defaults."  Renewal's threat to terminate, failure to extend the durations of the four agreements, and then actual termination are without substantial legal or factual foundation, are baseless, are made in bad faith, were done with the intention to harass Plaintiffs and put them out of business, and were done with the illegal and wrongful motive to steal the markets and the valuable customer lists, phone numbers, positive customer reviews, domain names and URLs, and to acquire all such items of property without paying for or at the expense of Plaintiffs.  Renewal also has and intends to wrongfully terminate the four agreements to avoid liability or responsibility for Andersen and Renewal's lack of disclosure and registration violations under the Federal Franchise Rule, Minnesota Franchise Act and the various state antitrust acts enumerated here.

252.    Plaintiffs are entitled to rescission of the Four Retailer agreements, rescission of the Renewal Enabled+ agreement, for an injunction prohibiting Defendants from using, distributing, or otherwise providing any of Dreamstyle's prospect / customer database

information to any other Renewal or Andersen affiliate or retailer.

253.    Plaintiffs are further entitled to all of their damages including but not limited to Loss of Business Value, Loss of Profits, Loss of their on-line reviews, Re-branding Expenses, Loss of Productivity, Loss of Customer Database, Loss of their on-line reviews and the other damages enumerated *infra* in an amount of no less than sixty-million dollars ($60,000,000) together with Plaintiffs' attorneys' fees and costs of suit.

## COUNT XI

## WRONGFUL TERMINATION – BREACH OF CONTRACT

254.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 253 as if restated herein in its entirety.

255.    Renewal never provided Dreamstyle with adequate notice or reasonable opportunity to cure any of the alleged "defaults."  Renewal's threat to terminate, failure to extend the durations of the four Retailer agreements, and the actual termination are without substantial legal or factual foundation, are baseless, are made in bad faith, were done with the intention to harass and damage Plaintiffs and put them out of business, and were done with the illegal and wrongful motive to steal the markets and the valuable customer lists, phone numbers, positive customer reviews, domain names, and URLs, and to acquire all such items of property without paying for or at the expense of Plaintiffs.

256.    Renewal also has and intends to wrongfully terminate the four agreements to avoid liability or responsibility for Andersen and Renewal's lack of disclosure and registration violations under the <u>Federal Franchise Rule</u>, <u>Minnesota Franchise Act</u>, and the various state antitrust acts enumerated here.

257.    Renewal never disclosed that once Dreamstyle had invested tens of millions of dollars in marketing expenses that Defendants would wrongfully refuse to extend the agreements, and would unilaterally terminate the agreements without good cause and

without first providing Plaintiffs an opportunity to cure or correct any alleged deficiencies in performance or otherwise, and that Defendants would steal the customer lists and exclusive territories developed by Dreamstyle through years and tens of millions of dollars in investments so that Defendants could offer the same to one or more of their preferred "retailers."

258.    As a direct and proximate result of Defendants' actions and wrongful termination, Plaintiffs have been damaged.

259.    Plaintiffs are entitled to rescission of the Four Retailer agreements, rescission of the Renewal Enabled+ agreement, for an injunction prohibiting Defendants from using, distributing, or otherwise providing any of Dreamstyle's prospect / customer database information to any other Renewal or Andersen affiliate or retailer.

260.    Plaintiffs are further entitled to all of their damages including but not limited to Loss of Business Value, Loss of Profits, Loss of their on-line reviews, Re-branding Expenses, Loss of Productivity, Loss of Customer Database and the other damages enumerated *infra* in an amount of no less than sixty million dollars ($60,000,000) together with Plaintiffs' attorneys' fees and costs of suit.

## COUNT XII

## TORTIOUS INTERFERENCE WITH CONTRACT

261.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 260 as if restated herein in its entirety.

262.    On August 14, 2018, Dreamstyle Remodeling, Inc. entered into a letter of intent with The Esler Companies, LLC whereby Dreamstyle would sell the Northern Arizona and Tucson markets to Esler for the sum of seven million dollars ($7,000,000).

263.    Defendants knew of the pending transaction and sale agreement between Dreamstyle Remodeling, Inc. and The Esler Companies and intentionally and maliciously

interfered with the same prior to the scheduled closing date of October 1, 2018.

264.   Defendants' intentional acts were designed to induce a breach of that contractual relationship and agreement between Dreamstyle and Esler Companies. Defendants' actions were not justified.

265.   As a result of Defendants' tortious interference, on September 5, 2018, Esler Companies terminated and cancelled its purchase of the Northern Arizona and Tucson Markets from Dreamstyle, resulting in the loss of seven million dollars ($7,000,000) in damages to Dreamstyle.

266.   In addition to the interference with the sale of the Tucson and Northern Arizona markets to Esler Companies, Defendants were aware of the existing business relationship and agreements Dreamstyle had with Kohler and the various Kohler distributors for the purchase and acquisition of Kohler bath products.  Defendants intentionally and maliciously interfered with those contracts by providing false and misleading information to Kohler about Dreamstyle and its principal, Larry Chavez.

267.   Defendants' intentional and malicious acts were designed to induce a breach or disruption of the contractual relationship, and there was an actual disruption of the contractual relationship between Kohler and the various Kohler distributors that Plaintiffs have agreements with resulting in damages to Dreamstyle in an amount to be proven at trial.

268.   Defendants have also provided false and misleading information to other third parties and have caused to be published false and misleading information about Dreamstyle and Chavez with the intention to interfere with Plaintiffs' ability to sell window, door, and other products associated with residential home remodeling projects in the numerous locations and regions serviced by Plaintiffs.

269.   The dissemination of false and misleading information by Defendants was wrongful and done with an evil heart and with the intention to substantially damage

Plaintiffs and to destroy the business of Plaintiffs, their owner Chavez, and the livelihoods of more than 600 employees.

270.    In addition to the above, Defendants have engaged in a systematic and deliberate process and other otherwise maliciously interfered with existing contracts between Dreamstyle and various third-party vendors, including among others Premier Marketing, causing them to cease doing business with Plaintiffs.

271.    Defendants were aware of the existing business relationships and agreements Dreamstyle had with its third-party vendors and suppliers.   Defendants were also aware of the existing business relationships Plaintiffs had with its prior and prospective customers as reflected by the thousands of positive customer reviews and ratings.

272.    Defendants' intentional and malicious acts were designed to induce a breach or disruption of the existing and prospective contractual relationships and there was an actual disruption of the contractual relationships between Premier Marketing, past and prospective customers, and others that Plaintiffs have agreements with resulting in damages to Dreamstyle in an amount to be proven at trial.

273.    As a result of Defendants' tortious interference, there has been an actual disruption of the current and potential contractual relationships that Plaintiffs have with their end-user residential customers resulting in damages to Plaintiffs.   Plaintiffs have been damaged in an amount to be proven at trial but in no event less than $10,000,000 plus Plaintiffs cost of suit.

274.    Plaintiffs also seek an award of punitive damages resulting from Defendant's evil and wrongful conduct.

**COUNT XIII**

**BREACH OF CONTRACT**

275.    Plaintiffs replead and incorporate by this reference each and every paragraph

1 to 274 as if restated herein in its entirety.

276.    In the alternative to the requests for rescission enumerated above, Plaintiffs allege that Four Retailer Agreements enumerated herein constitute valid and enforceable contracts.

277.    Plaintiffs have fully and faithfully performed under the Retailer Agreements or to the extent Plaintiffs have not such non-performance has been de minimis or such non-performance has been excused and waived by Defendants actions and conduct.

278.    Defendants have materially breached each of the four Retailer Agreements in numerous ways as enumerated above, and including without limitation, refusing without valid justification to extend the Northern Arizona Agreement, by wrongfully terminating the Tucson and New Mexico Agreements prematurely effective on January 31, 2019, and by wrongfully terminating the Boise Agreement without good cause effective January 31, 2019.

279.    Defendant Renewal materially breached the Retailer Agreement by failing to timely and fully reimburse and pay Plaintiffs for the warranty and service work performed by Plaintiffs at Defendant Renewal's request.

280.    As a direct and proximate result of Defendants material breaches, Plaintiffs have been damaged including but not limited to Loss of Business Value, Loss of Profits, Loss of their on-line reviews, Re-branding Expenses, Loss of Productivity, Loss of Customer Database and the other damages enumerated *infra* in an amount of no less than sixty million dollars ($60,000,000) together with Plaintiffs' attorneys' fees and costs of suit.

## COUNT XIV

## FRAUDULENT INDUCEMENT

281.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 280 as if restated herein in its entirety.

282.   During the course of the business relationship between Plaintiffs and Renewal, Renewal made misrepresentations (via false representations, concealment, and non-disclosure) regarding the intended nature, exclusivity, duration, and renewal rights of the relationships that Plaintiffs would enjoy under the four Retailer Agreements.

283.   At the time such misrepresentations were made, Defendants knew of their falsity.

284.   Defendants made the misrepresentations to the Plaintiffs for the express purpose of inducing Plaintiffs to sign the Retailer Agreements and for the purpose of inducing Plaintiffs reliance on such Retailer Agreements and for the purpose of inducing Plaintiffs to expend tens of millions of dollars in capital investments to build the Renewal brand and market share for the benefit of Renewal.

285.   Plaintiffs relied on the Defendants' misrepresentations in deciding to enter into the Retailer Agreements and in expending the tens of millions of dollars in capital investments to build the Renewal brand and market share for the benefit of Renewal.

286.   Plaintiffs' reliance as to the intended nature, exclusivity, duration, and renewal rights was justified.

287.   Had the Plaintiffs been aware that Defendants were misrepresenting the nature of the relationship, Plaintiffs would not have entered into the various Retailer Agreements or the Enabled+ agreement.

288.   As a result of Defendants' misrepresentations, Plaintiffs have been damaged in an amount to be proven at trial but in no event less than sixty million dollars ($60,000,000) plus Plaintiffs' cost of suit.

289.   Plaintiffs also seek an award of punitive damages resulting from Defendant's evil and fraudulent conduct.

## COUNT XV

## COMMON LAW FRAUD

290.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 289 as if restated herein in its entirety.

291.    Defendants made material misrepresentations of fact, material omissions of fact, and engaged in deceptive acts and practices, as set forth above, in connection with and in order to induce Plaintiffs to enter into the various contractual relationships with Defendants.

292.    Defendants knew that their representations, omissions, suppressions and deceptive acts were false; they engaged in this deceptive activity knowing that their words and actions were false and misleading; and with the intent that Plaintiffs rely upon them, that Plaintiffs purchase and acquire the territory rights; and that they execute the agreements and invest tens of millions of dollars in capital investments to build the Renewal brand and market share for the benefit of Renewal.

293.    Plaintiffs reasonably relied upon these representations, omissions, suppressions and other deceptive acts in deciding to enter into the Retailer Agreements and the Enabled+ agreement with Renewal and in investing substantial money to develop the businesses.

294.    Due to the Defendants' false representations, omissions, suppressions and deceptive acts, Plaintiffs have suffered damages in an amount of no less than sixty million dollars ($60,000,000).

295.    Defendants' actions were done intentionally and with an evil heart and evil mind and were designed to damage and destroy Plaintiffs and the business of Dreamstyle justifying an award of punitive damages.

## COUNT XVI

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

296.    Plaintiffs replead and incorporate by this reference each and every paragraph 1 to 295 as if restated herein in its entirety.

297.    New Mexico, Arizona, and Idaho law implies a covenant of good faith and fair dealing in all contracts between parties entered into or to be performed in each of those states.

298.    The actions of Defendants Renewal and Andersen, and each of them as set forth hereinabove, are in violation of the implied covenant of good faith and fair dealing and have caused the Plaintiffs to suffer damages.

299.    As a result of the actions of Defendants Renewal and Andersen, and each of them as set forth hereinabove, said Defendants have violated the implied covenant of good faith and fair dealing as against Plaintiffs herein, and as a result therefore, Plaintiffs are entitled to damages in an amount of no less than sixty million dollars ($60,000,000).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment in their favor and against each named Defendant, jointly and severally as follows:

(a)    Finding that Defendants engaged in unlawful and anti-competitive conduct, in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §1 and 2) and Sections 3 and 4 of the Clayton Act (15 U.S.C. §14 and 15);

(b)    Finding that Defendants engaged in unlawful and anti-competitive conduct in restraint of trade and commerce;

(c)    For an Order directing the termination of the anti-competitive conduct and injunctive relief that restores competition to the markets at issue, including but not limited to restoring Plaintiffs to the position they would have occupied but for

Defendants' unlawful exclusionary conduct;

(d)    For an Order prohibiting Defendants from using, disseminating, converting, or otherwise providing access to any of the 165,500+ Dreamstyle prospects and customers maintained on the Enabled+ database to any other Renewal Retailer and for an order preventing Defendants from attempting to convert such prospects into the sale of Renewal Products.   To the extent that Defendants have already mined or otherwise distributed Dreamstyle's prospect database to its own marketing departments or other replacement affiliates, for an order paying Plaintiffs the reasonable value of such database;

(e)    For rescission of the Four Retailer Agreements.

(f)    For Dreamstyle's direct damages for lost profits, loss of business valuation, damage to business reputation, loss of its prospect database, costs associated with launching with one or more new manufacturers, re-branding expenses, and other direct damages enumerated above in the amount to be proven at trial but in no event less than sixty million dollars ($60,000,000);

(g)    Treble Dreamstyle's aggregate damages of (including lost profits), in an amount to be determined at trial but in no event less than one hundred eighty million dollars ($180,000,000);

(h)    For Dreamstyle's costs of suit herein, including its attorneys' fees actually incurred;

(i)    For restitutionary relief; and

(j)    Such other relief as may be just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs respectfully request trial by jury on all of the issues pled so triable.

- 71 -

DATED this 20th day of November 2019.

BLUFF & ASSOCIATES

_____

Guy W. Bluff, Esq.
Attorneys for Plaintiffs

2019-11-20 Dreamstyle NM Complaint (Final)

| Ex | Date | Description | Paragraph |
|---|---|---|---|
| A | 1-Feb-2014 | Northern Arizona Retailer Agreement (2nd) | 31, 41, 75, 107 |
| B | 1-Jul-2014 | San Diego Retailer Agreement | 47, 108 |
| C | 1-Nov-2014 | Tucson Retailer Agreement (2nd) | 54, 108 |
| D | 8-Jun-2015 | Boise Retailer Agreement | 59, 76, 110 |
| E | 1-May-2015 | New Mexico Retailer Agreement (3rd) | 27, 28, 29, 62, 77, 106, 111 |
| F | 8-May-2018 | Renewal (Junker) - Notice of Termination and List of 9 Violations | 138, 146 |
| G | 8-May-2018 | Dreamstyle Response to 5/8/2018 Termination Letter | 144 |
| H | 10-May-2018 | Renewal (Junker) - Termination Agreement for Signature | 144, 181 |
| I | 17-May-2018 | Dreamstyle (Chavez) Response to 05/17/2018 Renewal (Junker) Letter | 144 |
| J | 17-May-2018 | Dreamstyle (Bluff) Request for Detailed Explanation of 9 Alleged Violations | 145 |
| K | 1-Jun-2018 | Renewal (Junker) Response to Dreamstyle's 05/17/2018 Request for Information | 145 |
| L | 12-Jun-2018 | Renewal (Junker) Notice of Intent to Immediately Terminate | 146 |
| M | 17-Jul-2018 | Dreamstyle Request to Extend Northern Arizona Agreement | 147 |
| N | 24-Jul-2018 | Renewal (Junker) - Refusal to Extend / Renew Northern Arizona Agreement | 147 |
| O | 6-Sep-2018 | Dreamstyle Request to Mitigate Damages Resulting from Termination | 149 fn7 |

| Ex | Date | Description | Paragraph |
|----|------|-------------|-----------|
| P | 17-Sep-2018 | Dreamstyle (Chavez) E-Mail to Renewal (Junker) re Status of Transition and Efforts to Mitigate Damages | 149 fn7 |
| Q | 18-Sep-2018 | Renewal (Junker) Response to Chavez 09/17/2018 E-Mail - Sale of Other Products Not Permitted | 149 fn7 |
| R | 19-Sep-2018 | Dreamstyle (Bluff) Response to Junker's 09/18/2018 Termination Notice | 149 fn7 |
| S | 2-Oct-2018 | Dreamstyle (Bluff) Transmittal of Draft Mutual Termination Agreement | 149 fn7 |
| T | 2-Oct-2018 | Dreamstyle-RBA Mutual Termination Agreement (V5.3) | 149 fn7 |
| U | 29-Oct-2018 | Renewal (Junker) Termination of All Retailer Agreements Effective 01/31/2019 | 150 |
| V | 4-Aug-2014 | Renewal (Junker) - Integrity in Hiring Memorandum | 142 fn6 |
| W | 17-Feb-2018 | Summary of Andersen Manufacturing Defects - Hageman Project | 142 fn5 |
| X | 14-Dec-2017 | Renewal (Junker) - Patio Door Update Memorandum - Ongoing Quality Problems | 124 |
| Y | 5-Jan-2019 | Professor of Architecture Alexander Maller complaint of Andersen product quality | 125 fn3 |